# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 20, 2011     Decided February 17, 2012

No. 09-1112

BLUE RIDGE ENVIRONMENTAL DEFENSE LEAGUE,
PETITIONER

v.

NUCLEAR REGULATORY COMMISSION AND UNITED STATES OF
AMERICA,
RESPONDENTS

TENNESSEE VALLEY AUTHORITY,
INTERVENOR

Consolidated with 10-1058

On Petitions for Review of Orders
of the Nuclear Regulatory Commission

*James B. Dougherty* argued the cause and filed the briefs for petitioner.

*Jeremy M. Suttenberg*, Attorney, U.S. Nuclear Regulatory Commission, argued the cause for respondents. With him on the brief were *Lane McFadden*, Attorney, U.S. Department of Justice, *Stephen G. Burns*, General Counsel, U.S. Nuclear Regulatory Commission, *John F. Cordes, Jr.*, Solicitor, and

*Grace H. Kim*, Senior Attorney.

*Maria V. Gillen*, Attorney, argued the cause for intervenor. With her on the brief was *Harriet A. Cooper*, Assistant General Counsel.

Before: GARLAND and KAVANAUGH, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: In December 1974, Tennessee Valley Authority ("TVA") received construction permits from the Atomic Energy Commission, the predecessor to the Nuclear Regulatory Commission ("the NRC" or "the Commission"), for the Bellefonte Nuclear Plant, Units 1 and 2 ("the units"). TVA pursued construction under a series of permit extensions through the late 1980s, when, based on its projections of diminished energy demand, it decided to place the units in "deferred status" and establish a maintenance program under the NRC's Policy Statement on Deferred Plants ("the Policy Statement"). *See* 52 Fed. Reg. 38,077, 38,077–79 (Oct. 14, 1987). Under the Policy Statement, during a deferral period, a permit holder is required to undertake maintenance and preservation activities but may halt actual construction. In 2005, TVA placed the units in "terminated" status under the Policy Statement. One year later, TVA voluntarily requested that the NRC withdraw the permits. The NRC granted this request.

In 2008, TVA asked the NRC to reinstate its withdrawn construction permits. Although neither withdrawal nor reinstatement are specifically addressed in the Atomic Energy Act ("the AEA" or "the Act"), *see* 42 U.S.C. § 2239 (2006), the NRC granted TVA's reinstatement request in an order issued on March 9, 2009 and published in the *Federal Register* on March 13, 2009.

On March 30, 2009, the Blue Ridge Environmental Defense League ("BREDL" or "Petitioner") filed a petition with this court, purporting to challenge the NRC's decision to reinstate the construction permits. However, in its Statement of Issues To Be Raised, in its Reply Brief, and during oral argument, BREDL insisted that it was not challenging the NRC order that was published in the *Federal Register* on March 13, 2009. Rather, BREDL asserted that its March 30, 2009 petition for review challenges only a compilation of "Response Sheets" filed by individual Commissioners in December 2008 and January 2009.

BREDL contends that this compilation of Commissioners' views resulted in a final order on January 27, 2009. We disagree. After the Commissioners' "Response Sheets" were assembled, the matter was referred to the NRC staff for evaluation. However, it was not until February 18, 2009 that the NRC authorized the staff to issue an order on behalf of the agency reinstating the construction permits. That order was published in the *Federal Register* on March 13, 2009. Therefore, BREDL's petition for review challenging an alleged action of the NRC taken on January 27, 2009 does not seek review of a final NRC order.

On May 8, 2009, BREDL, along with some other parties, petitioned the NRC to intervene in an agency good cause hearing on the Commission's action reinstating the construction permits. The NRC decided to hear BREDL's legal contentions first, before addressing technical contentions primarily regarding the safety of reinstating the construction permits. On January 7, 2010, the NRC issued an opinion rejecting BREDL's legal claims and referring BREDL's remaining claims to the Atomic Safety and Licensing Board ("the ASLB") for disposition. On March 8, 2010, before the ASLB had addressed BREDL's remaining contentions, BREDL filed its second petition for review with this court. This second petition challenges the NRC's January 7, 2010 opinion rejecting BREDL's legal claims.

BREDL contends that the agency's January 7 opinion qualifies as a final agency action that is subject to judicial review. We disagree. It is clear on the record here that the NRC's January 7 opinion was merely an interlocutory action addressing BREDL's legal challenges to the Commission's authority. BREDL had raised numerous other claims that were referred to the ASLB, and those claims remained pending before the NRC when BREDL filed its premature petition for review on March 8, 2010.

Under the Hobbs Act, this court has jurisdiction to review only "final orders" of the NRC. 28 U.S.C. § 2342(4) (2006). The March 30, 2009 and March 8, 2010 petitions filed by BREDL with this court do not seek review of final NRC orders. Therefore, we lack jurisdiction and must dismiss.

## I.  Background

### A.  Facts

The AEA provides the general framework that governs the construction of nuclear power plants. Before a company can build a plant, it must seek a construction permit from the NRC. *See* 42 U.S.C. § 2235(a). All construction permits must specify the latest date by which construction must be complete, although the NRC can extend deadlines for good cause. *Id.* All of a permit holder's rights and privileges are "forfeited" when a permit "expire[s]" on the designated completion date. *Id.* The AEA also authorizes the NRC to revoke a construction permit prior to completion in the event of wrongdoing. *See id.* § 2236. But the Act does not account for the possibility that a permit holder might voluntarily request that the NRC withdraw a valid construction permit, nor does it address whether the NRC may reinstate a construction permit that has been withdrawn. *See id.* § 2239.

TVA first applied for construction permits for the units in 1973. *See In re Tenn. Valley Auth.*, 71 N.R.C. 113, 115 (2010),

*reprinted in* Joint App. ("J.A.") 14. The ASLB considered interested citizens' intervention requests, conducted an evidentiary hearing, and issued a favorable decision in December 1974. The permits for the units were set to expire in 1979 and 1980 respectively. *See id.* at 115–16. But by 1979, TVA realized that it would not be able to complete construction by the deadlines due in part to labor shortages, delivery problems, and the need for new safety features following the Three Mile Island accident. *See* TVA, Bellefonte Nuclear Plant, Units 1 and 2; Order Extending Construction Completion Dates, 44 Fed. Reg. 76,893, 76,893 (Dec. 28, 1979). TVA thus requested, and the NRC granted, an extension of the permit deadlines. *See id.* But TVA found that it could not complete construction by the new deadlines, and it again submitted timely extension requests, which the NRC granted. *See* TVA, Bellefonte Nuclear Plant, Units 1 and 2; Order Extending Construction Completion Dates, 52 Fed. Reg. 25,676, 25,676 (July 8, 1987).

Soon after the 1987 extension, TVA decided to defer construction of the plants under the Commission's Policy Statement. *In re Tenn. Valley Auth.*, 71 N.R.C. at 116. At the time of deferral, Units 1 and 2 were approximately ninety and sixty percent complete, respectively. *Id.* Under the Policy Statement, a permit holder may resume construction of a plant only after providing at least an 120-day notice to the NRC and receiving the NRC's approval that the plant's systems, structures, and components are acceptable. *See* 52 Fed. Reg. at 38,079. TVA provided notice of its intent to resume construction in 1993 and requested deadline extensions for its permits. *In re Tenn. Valley Auth.*, 71 N.R.C. at 116–17. The NRC granted this request, extending Unit 1's deadline into 2001 and Unit 2's deadline into 2004. *See* In the Matters of TVA (Bellefonte Nuclear Plant, Units 1 and 2), 59 Fed. Reg. 34,874, 34,874–75 (July 7, 1994). Shortly thereafter, TVA decided that the units could not be completed without additional financial

support, and it suspended further construction pending completion of a comprehensive evaluation of its power needs.

Although the units were in deferred status, TVA requested further extensions in 2001. *See In re Tenn. Valley Auth.*, 71 N.R.C. at 117. NRC approved this request in March 2003, extending the permits for Units 1 and 2 into 2011 and 2014, respectively. *See* In the Matters of TVA (Bellefonte Nuclear Plant, Units 1 and 2); Order, 68 Fed. Reg. 11,415, 11,415–16 (Mar. 10, 2003). As completion continued to be delayed, however, TVA placed the units in terminated status, concluding that they could not be justified economically. *See In re Tenn. Valley Auth.*, 71 N.R.C. at 117. TVA's board of directors voted to cancel construction, and, in 2006, TVA formally requested that the NRC withdraw the permits. The Commission granted TVA's request by letter that same year. *See id.*

TVA recounts that, in 2008, a number of factors – the estimated cost per kilowatt of installed capacity among generation alternatives, the number of worldwide suppliers capable of providing necessary reactor components, and the number of entities expressing interest in developing new nuclear generation capacity – augured in favor of completing construction of the units. In light of these changed circumstances, TVA requested by letter that the NRC reinstate the permits and return the plants to "deferred" status, such that TVA could resume preservation and maintenance activities to prepare the plants for construction. *See id.* at 117–18.

## B. Procedural History

Because this court's jurisdiction under the Hobbs Act turns on the finality of the challenged agency actions, we offer a somewhat detailed description of both the internal procedures followed by the NRC with respect to TVA's reinstatement request and BREDL's petitions for review.

In a "tasking memorandum" issued on October 30, 2008,

the NRC Chairman directed the NRC staff to provide its views and recommendations on TVA's reinstatement request. *See* Memorandum from R. W. Borchardt, Exec. Dir. for Operations, to Chairman Klein, Commissioner Jaczko, Commissioner Lyons, and Commission Svinicki 1 (Dec. 12, 2008) ("Borchardt Memo"), *reprinted in* J.A. 92 (describing staff's responsibilities under Chairman's tasking memo). The staff submitted its response on December 12, 2008, asking for authorization from the Commissioners "for the recommendation to go forward with the review and action on [TVA's] request." *Id.* The staff's memorandum states:

> If the Commission agrees with the staff's recommendation, the staff will evaluate TVA's request for reinstatement to determine whether it is supported by good cause, considering the totality of the circumstances. If the staff finds the request acceptable, *it will prepare an order* granting the request, with conditions, an environmental assessment, and a supporting safety evaluation.

*Id.* (emphasis added).

In the weeks that followed, the four NRC Commissioners submitted individual "Response Sheets" to the staff's memorandum. Three indicated their general approval of the reinstatement request, although they recommended that the units be placed in "terminated," rather than "deferred," status. *See* Response Sheet from Chairman Klein to Annette Vietti-Cook (Jan. 9, 2009); Response Sheet from Commissioner Lyons to Annette Vietti-Cook (Jan. 7, 2009); Response Sheet from Commissioner Svinicki to Annette Vietti-Cook (Dec. 22, 2008), *reprinted in* J.A. 1–2, 9–13. The fourth Commissioner to respond, Commissioner Jaczko, disapproved of the reinstatement request. *See* Response Sheet from Commissioner Jaczko to Annette Vietti-Cook (Jan. 27, 2009), *reprinted in* J.A. 3–8.

On February 18, 2009, the Commission authorized the staff to issue an order reinstating the construction permits and place Bellefonte Units 1 and 2 in "terminated" status under the agency's Policy Statement, rather than the "deferred" status TVA sought. *In re Tenn. Valley Auth.*, 71 N.R.C. at 118. The Commission also directed the staff to offer a hearing opportunity on the question of whether TVA had established "good cause" for reinstatement. The staff "then prepared an environmental assessment which concluded that reinstatement of the construction permits would not result in a significant environmental impact." *Id.*

On March 9, 2009, an order was issued by the agency authorizing reinstatement of the construction permits for Units 1 and 2. The order was published in the *Federal Register* on March 13, 2009. *See* In the Matter of TVA (Bellefonte Nuclear Plant Units 1 and 2); Order, 74 Fed. Reg. 10,969 (Mar. 13, 2009). The order states "*it is hereby ordered that* [construction permits] . . . for the construction of [Bellefonte] Units 1 and 2, respectively, are reinstated, and the facility returned to a terminated plant status . . . . *It is also ordered* . . . that the expiration dates defining the latest construction completion dates . . . are October 1, 2011, and October 1, 2014, respectively." *Id.* at 10,970 (second emphasis added) (citation omitted). The order also provided notice that parties could request a limited agency hearing to address whether good cause supported reinstatement and invited participation in that hearing. *See id.* at 10,969.

On March 30, 2009, BREDL filed a petition with this court, "for review of the final determination by [the NRC] to reinstate construction permits that had previously been issued by the NRC to the [TVA] and were subsequently withdrawn and rendered void." Pet. for Review 1, Mar. 30, 2009. The petition stated that, "[t]hough the exact date on which the NRC took final action reinstating the construction permits is uncertain, the

action was announced in the March 13, 2009 edition of the Federal Register." *Id.* Copies of the NRC Commissioners' "Response Sheets" were attached to BREDL's petition for review. On April 30, 2009, BREDL filed a Statement of Issues To Be Raised, advising the court that, "[o]n information and belief, the final action of the NRC was taken on January 27, 2009, in a compilation of written decision[s] by the four individual NRC Commissioners." Pet'r's Statement of Issues To Be Raised 1, Apr. 30, 2009. This point was emphasized further by BREDL in its Reply Brief to the court, which states:

> The NRC asserts (NRC Br. at 12), incorrectly, that BREDL filed the first petition for review in this Court "[i]n response to the [March 13] Federal Register notice" . . . . What *actually* happened is that BREDL challenged the January 27, 2009 Commission decision, and it attached a copy of the four-part decision, not the subsequent *Federal Register* notice, to its petition for review.

Pet'r's Reply Br. at 3 (first and second alterations in original).

On May 8, 2009, while its first petition for review was pending before this court, BREDL, along with other environmental groups, petitioned the NRC to intervene in the agency's good cause hearing. *See In re Tenn. Valley Auth.*, 71 N.R.C. 118–19. The petition offered nine "contentions" opposing the reinstatement – including both legal claims that the NRC lacked authority to reinstate withdrawn permits under the AEA and technical contentions addressing other concerns related to reinstatement. *See id.* In an order issued on May 20, 2009, the NRC advised the parties that it intended "to resolve [BREDL's] threshold 'authority' issue before taking action on Petitioners' other contentions." *In re Tenn. Valley Auth.*, Order, *reprinted in* J.A. 243. The Commission also directed the parties and the NRC staff to submit briefs "addressing the question whether the NRC possesses the statutory authority to reinstate the withdrawn construction permits." *Id.* Finally, the

Commission's order made it clear that

> [t]he remainder of Petitioners' proposed contentions will be held in abeyance, pending the Commission's ruling on the threshold "authority" issue. The Commission may refer Petitioners' remaining contentions to the Atomic Safety and Licensing Board Panel at a future date.

*Id.*, *reprinted in* J.A. 244. Meanwhile, on June 11, 2009, this court granted the NRC's unopposed motion to hold in abeyance BREDL's March 30, 2009 petition for review, pending the NRC's disposition of the challenges raised by BREDL in its petition to intervene in the agency's good cause hearing. *See* Clerk's Order, June 11, 2009.

On January 7, 2010, after receiving arguments on BREDL's legal contentions, the NRC issued an opinion holding that the Commission has authority under the AEA to reinstate previously withdrawn construction permits. *See In re Tenn. Valley Auth.*, 71 N.R.C. at 115. The opinion also referred BREDL's technical contentions to the ASLB. On this point, the opinion says:

> This decision addresses the "authority" question only, a question raised in Petitioners['] Contentions 1 and 2. We hold that NRC has authority to reinstate surrendered construction permits. We refer the remainder of the petition to intervene and request for hearing, including Petitioners' July 15, 2009, supplemental filing to the Atomic Safety and Licensing Board Panel for further proceedings. Once a Licensing Board is convened, it will have to decide in the first instance whether Petitioners have established standing and have raised admissible contentions and if so, given their claims, whether reinstatement on the particular facts presented here is lawful and proper – that is, whether there is "good cause" for reinstatement.

*Id.* at 126.

On March 8, 2010, after the Commission had rejected BREDL's legal contentions, but before the ASLB could consider BREDL's remaining contentions, BREDL filed its second petition for review with this court. This second petition challenges the NRC's January 7, 2010 opinion holding that the agency has the authority to reinstate the construction permits for Units 1 and 2. BREDL's consolidated petitions are now before us.

## II.   Analysis

### A.   Standard of Review

The Hobbs Act grants appellate courts jurisdiction to review "final orders" issued by the NRC. 28 U.S.C. § 2342(4). Thus, we must determine *de novo* whether either of BREDL's petitions seeks review of a final order. *See, e.g.*, *Waters v. Rumsfeld*, 320 F.3d 265, 271 (D.C. Cir. 2003) ("[W]e have an independent obligation to determine jurisdiction de novo." (citation omitted)).

"[T]he relevant considerations in determining finality are whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the agency action." *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970) (citations omitted); *see also Massachusetts v. U.S. Nuclear Regulatory Comm'n*, 878 F.2d 1516, 1519–20 (1st Cir. 1989). In *Bennett v. Spear*, 520 U.S. 154 (1997), which addressed the requirement of finality under the Administrative Procedure Act, 5 U.S.C. § 704 (2006), the Supreme Court explained that

> [a]s a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the "consummation" of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature.

And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

520 U.S. at 177 (citations omitted). Finality under the Hobbs Act is to be "narrowly construed[;] . . . [a]n order is final if it 'imposes an obligation, denies a right, or fixes some legal relationship, usually at the consummation of an administrative process.'" *Natural Res. Def. Council, Inc. v. U.S. Nuclear Regulatory Comm'n*, 680 F.2d 810, 815 (D.C. Cir. 1982) (citations omitted). And in the context of administrative adjudications, "a final order is [normally] one that disposes of all issues as to all parties." *Citizens for a Safe Env't v. Atomic Energy Comm'n*, 489 F.2d 1018, 1021 (3d Cir. 1973) (citation omitted).

## B. Finality

### 1. BREDL's March 30, 2009 Petition for Review

As noted above, when BREDL filed its first petition for review on March 30, 2009, it was not entirely clear what specific NRC action BREDL sought to have reviewed. That petition states:

> Petitioner Blue Ridge Environmental Defense League hereby petitions this Court for review of the final determination by Respondent Nuclear Regulatory Commission ("NRC") to reinstate construction permits that had previously been issued by the NRC to the Tennessee Valley Authority ("TVA") and were subsequently withdrawn and rendered void. The construction permits in question, which were issued December 24, 1974, had authorized TVA to construct two nuclear reactors – Bellefonte Units 1 and 2 – in Jackson County, Alabama.
>
> Though the exact date on which the NRC took final action reinstating the construction permits is uncertain, the

> action was announced in the March 13, 2009 edition of the Federal Register, 74 Fed. Reg. 10969.
>
> A copy of the NRC decision document (actually a compilation of decisions[] by each of the four sitting NRC Commissioners) is attached.

Pet. for Review 1–2, Mar. 30, 2009.

At first blush, one might suppose that BREDL meant to contest the agency's order that was published in the *Federal Register* on March 13, 2009. It is true that the petition says that the "exact date on which the NRC took final action reinstating the construction permits is uncertain." But the petition was filed after publication of the Commission's order, and it explicitly acknowledges that the agency's "action was announced in the March 13, 2009 edition of the Federal Register, 74 Fed. Reg. 10969." Indeed, the briefs filed by the NRC and Intervenor TVA appear to assume that BREDL's March 30, 2009 petition for review challenges the agency order that was published on March 13, 2009. It is therefore somewhat perplexing that BREDL insists otherwise.

As noted above, in its Statement of Issues To Be Raised, BREDL asserted that "the final action of the NRC was taken on January 27, 2009, in a compilation of written decision[s] by the four individual NRC Commissioners." Pet'r's Statement of Issues To Be Raised 1, Apr. 30, 2009. Then in its Reply Brief filed with the court, BREDL made it clear that its March 30, 2009 petition sought review *only* of "the January 27, 2009 Commission decision, . . . not the subsequent *Federal Register* notice." Pet'r's Reply Br. at 3. And during oral argument, when pressed on this point, BREDL's counsel positively confirmed that the petition for review was meant to focus *solely* on the composite statements of the NRC Commissioners as expressed in their "Response Sheets" written in December 2008 and January 2009.

In light of these facts, there is only one, inescapable conclusion. By repeatedly insisting that it never sought review of the order that was published in the *Federal Register* on March 13, 2009, BREDL has effectively confirmed that it did not seek review of a final order.

There are several reasons why BREDL was incorrect to conclude that the Commissioners' "Response Sheets" constitute a final order. First, as recounted above, the NRC staff's memorandum to the Commissioners seeking authorization to consider TVA's request makes explicit that such authorization was only the first step toward a final reinstatement order. *See* Borchardt Memo 1, *reprinted in* J.A. 92. After the Commissioners returned their "Response Sheets," the staff still had to exercise its independent judgment to prepare an environmental assessment.

Second, the Commissioners clearly anticipated that after submitting their "Response Sheets," the NRC staff would engage in deliberation and independent review before issuing a reinstatement order on behalf of the agency. The following statements from the "Response Sheets" – dealing primarily with whether to place the units in "deferred" or "terminated status" – are particularly illustrative of the fact that the "Response Sheets" do not constitute, or even resemble, the consummation of the administrative process.

- "I approve the staff's request *to proceed with the review of TVA's request*, and I approve the reinstatement of the [construction permits] *if the staff concludes that TVA's request is acceptable*. However, I disapprove the proposal for concurrent placement of the facility in a deferred plant status; instead, I support the sequential approach for placing the facility in a deferred plant status . . . ." Response Sheet from Chairman Klein to Annette Vietti-Cook (Jan. 9, 2009) (emphasis added), *reprinted in* J.A. 2.

- "The staff . . . requests Commission authorization *to review and take action on TVA's request*. As proposed, *if the staff were to find the request acceptable*, *it would prepare an order reinstating the construction permits . . . .*" *Id.* (emphasis added).

- "Therefore, *as an alternative*, *if the request is found acceptable*, *the staff should issue an order* reinstating the construction permits, which to my understanding will *de facto* place the facility in 'terminated status' . . . ." *Id.* (emphasis added).

- "I approve in part and disapprove in part the staff's recommendation to reinstate the construction permits for Bellefonte Units 1 and 2. . . . [T]he agency can fully accomplish its regulatory role, with no loss of public involvement, through a path that utilizes reinstatement of the construction permits, but to a 'terminated plant' status." Response Sheet from Commissioner Lyons to Annette Vietti-Cook (Jan. 7, 2009), *reprinted in* J.A. 10.

- "I approve in part and disapprove in part the staff's recommendation to reinstate the construction permits . . . . In my view, however, it would be premature to restore Bellefonte all the way to deferred plant status immediately . . . ." Response Sheet from Commissioner Svinicki to Annette Vietti-Cook (Dec. 22, 2008), *reprinted in* J.A. 12.

- "This does not lead me to conclude, however, that we should allow TVA to jump immediately to deferred plant status without a demonstration that Bellefonte satisfies what we would have required under the Policy Statement . . . ." *Id.*, *reprinted in* J.A. 13.

- "Should physical deficiencies be identified, such as hardware requiring replacement or records requiring

reconstitution, *I propose* that TVA will need to address those items *to* [*the*] *staff's* satisfaction." *Id.* (emphasis added).

The Commission did not finally authorize the staff to issue an order on behalf of the agency until February 18, 2009, and that order was not published in the *Federal Register* until March 13, 2009. *See In re Tenn. Valley Auth.*, 71 N.R.C. at 118.

Third, lest there is any possible doubt in this matter, it cannot be gainsaid that the NRC's order published on March 13 qualifies as final. The order marked the clear "consummation" of the NRC's "administrative process," *Natural Res. Def. Council, Inc.*, 680 F.2d at 815 – a process that, here, featured the staff's request to proceed with an evaluation of TVA's request, and the Commission's February 18, 2009 authorization which allowed the staff to pursue its evaluation and then issue an order on behalf of the agency. Furthermore, the order determined the "rights [and] obligations" of affected parties. *Bennett*, 520 U.S. at 178. The units were placed in "terminated," rather than "deferred," status; interested parties were afforded the right to "request a hearing . . . within 60 days"; and the scope of the hearing was limited "to whether good cause exists for the reinstatement of the [construction permits]." In the Matter of TVA (Bellefonte Nuclear Plant Units 1 and 2); Order, 74 Fed. Reg. at 10,969.

BREDL's March 30, 2009 petition is not saved by BREDL's claim at oral argument that it had to treat the Commissioners' "Response Sheets" as constituting a final order, because, as of the date that the last "Response Sheet" was submitted, BREDL had no way of knowing that the NRC staff would take subsequent action on TVA's request. This argument is belied by the fact that BREDL did not actually submit its petition until after the NRC published its final order on March 13, 2009. Indeed, BREDL even cited that order in its March 30, 2009 petition for review. Therefore, BREDL easily could have

amended its petition and Statement of Issues To Be Raised correctly to seek review of the agency's order that was published in the *Federal Register* on March 13, 2009. Or, at the very least, BREDL could have filed a protective petition for review of the March 13, 2009 order. *Cf. Massachusetts v. U.S. Nuclear Regulatory Comm'n*, 924 F.2d 311, 315 (D.C. Cir. 1991) (describing that petitioners filed a "third . . . [duplicative] petition . . . as a precaution to preserve [their] opportunity for appellate review of the full power issues").

We recognize, however, that BREDL still might have stepped into a jurisdictional frying pan. Under the law of this circuit, when a party "petitions [an] agency for reconsideration of an order or any part thereof, the entire order is rendered nonfinal as to that party." *Bellsouth Corp. v. FCC*, 17 F.3d 1487, 1489–90 (D.C. Cir. 1994). The NRC argues that BREDL's petition to intervene in the NRC's good cause hearing was the functional equivalent of a motion for reconsideration. In other words, according to the NRC, once BREDL filed its petition to intervene in the agency's for cause hearing, its prior petition for review was "incurably premature." *TeleSTAR, Inc. v. FCC*, 888 F.2d 132, 134 (D.C. Cir. 1989) (per curiam). We need not address this claim, however, given our conclusion that BREDL failed to seek review of a final order in its initial petition.

In sum, BREDL has insisted that its March 30, 2009 petition sought review *only* of the NRC Commissioners' "Response Sheets" – documents which led to the NRC's February 18, 2009 action authorizing the staff to undertake an evaluation of TVA's proposed course of action and then to issue a final order on behalf of the agency. Because these documents do not constitute a "final order," they are not the appropriate subject of judicial review.

### 2. *BREDL's March 8, 2010 Petition for Review*

On May 8, 2009, BREDL petitioned to intervene in the NRC's good cause hearing on the reinstatement order. *See* Pet. for Intervention and Req. for Hr'g by the Blue Ridge Environmental Defense League, Its Chapter Bellefonte Efficiency and Sustainability Team and the Southern Alliance for Clean Energy 1, *reprinted in* J.A. 187. BREDL's petition advanced nine specific contentions against reinstatement: two legal contentions regarding the NRC's authority to reinstate withdrawn construction permits under the AEA and seven technical contentions regarding the safety of reinstating the permits. *See id.* at 12–38.

The NRC viewed the legal contentions as "potentially dispositive," *In re Tenn. Valley Auth.*, 71 N.R.C. at 118, and consequently directed the parties to brief and argue them exclusively, *id.* The remaining seven contentions were held in abeyance. *Id.* at 118–19. On January 7, 2010, the NRC issued an opinion rejecting BREDL's legal contentions, holding that the Commission has the authority to reinstate withdrawn construction permits under the AEA. *See id.* at 115. The NRC then "refer[red] the remainder of the petition to intervene and request for hearing . . . to the [ASLB] Panel for further proceedings." *Id.* at 126. BREDL filed a petition for review with this court on March 8, 2010, seeking review of the NRC's January 7 opinion. But once again, BREDL sought review of a nonfinal action.

Even after the NRC issued its opinion on January 7, the ASLB still had to consider BREDL's outstanding nonlegal contentions. Therefore, it is axiomatic that the January 7 opinion did not "dispose[] of all issues as to all parties," *Citizens for a Safe Env't*, 489 F.2d at 1021, or fix the parties' rights and obligations. Instead, the NRC's January 7 opinion was a "nonfinal, interlocutory order," similar to the order challenged in *City of Benton v. Nuclear Regulatory Commission*, 136 F.3d

824, 825 (D.C. Cir. 1998) (per curiam).

In *City of Benton*, the petitioners, several municipal utilities, opposed an NRC amendment to an operating license on antitrust grounds, *see id.* at 824–25, while another party challenged the NRC's initial licensing decision on safety grounds, *see id.* at 825. An individual NRC director issued a ruling on May 30, finding no significant antitrust issues. *Id.* On June 8, the NRC issued final orders allowing the proposed amendments to go into effect. *Id.* The petitioners sought this court's review of the May 30 antitrust ruling, not the final orders. But as this court explained,

> [a]lthough the Director's May 30 finding addressed the antitrust issues . . ., it did not discuss the NRC's safety determination which was still pending before the NRC. Further, the Director's May 30 finding did not result in the grant or denial of [the] request to amend the license. Not until the license amendments were issued on June 8 did the NRC conclusively determine the antitrust and safety issues.

*Id.* Thus, the court dismissed for lack of jurisdiction. *See id.* at 826. The same reasoning compels dismissal here.

BREDL seeks refuge in this court's cases carving out an exception to the Hobbs Act's finality rule when the Commission issues an "immediate effectiveness" ruling. But this exception is unavailing to Petitioner. In the context of NRC actions, an order issued during ongoing administrative proceedings is reviewable pursuant to this exception if, for example, it authorizes a plant operator to operate at full power pending further review by the Commission. *See Massachusetts*, 924 F.2d at 322. But as BREDL concedes, even after the agency's issuance of its January 7, 2010 opinion, TVA remained many steps away from even reinitiating construction, let alone generating actual electricity. Thus, the NRC's ruling was not equivalent to an "immediately effective order"; instead, it

merely narrowed the issues confronting the ASLB in the good cause hearing.

In sum, BREDL's March 8, 2010 petition seeks review of an interlocutory ruling by the NRC. And because the ruling was not a final order subject to our jurisdiction under the Hobbs Act, we must dismiss the petition for review.

## III.    Conclusion

The petitions for review are hereby dismissed for want of jurisdiction.

*It is so ordered.*