# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 5, 2019   Decided August 28, 2020

No. 18-1235

BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN,
A DIVISION OF THE RAIL CONFERENCE OF THE INTERNATIONAL
BROTHERHOOD OF TEAMSTERS, AND TRANSPORTATION
DIVISION OF THE INTERNATIONAL ASSOCIATION OF SHEET
METAL, AIR, RAIL AND TRANSPORTATION WORKERS,
PETITIONERS

v.

FEDERAL RAILROAD ADMINISTRATION AND UNITED STATES
DEPARTMENT OF TRANSPORTATION,
RESPONDENTS

KANSAS CITY SOUTHERN RAILWAY COMPANY AND TEXAS
MEXICAN RAILWAY COMPANY,
INTERVENORS

On Petition for Review of a Final Decision of
the Federal Railroad Administration

*Kathy L. Krieger* argued the cause for petitioners. With
her on the briefs were *Michael S. Wolly* and *Lawrence M.
Mann*.

*Jaynie Lilley*, Attorney, U.S. Department of Justice, argued the cause for respondents. With her on the briefs were *H. Thomas Byron III*, Attorney, *Steven G. Bradbury*, General Counsel, U.S. Department of Transportation, *Paul M. Geier*, Assistant General Counsel for Litigation and Enforcement, *Joy K. Park*, Senior Trial Attorney, and *Rebecca S. Behravesh*, Senior Attorney, Federal Railroad Administration.

*Aaron S. Markel* argued the cause for intervenors. With him on the brief was *Donald J. Munro*.

Before: TATEL, MILLETT, and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* TATEL.

MILLETT, *Circuit Judge*: By leave of the Federal Railroad Administration, two United States railroads began allowing engineers and conductors employed by their Mexican affiliate to operate trains on their tracks in the United States. Labor unions representing employees of the two railroads petition for review of the Railroad Administration's asserted approval of the new rail operations.

We grant the petition in part and vacate and remand in part because of the Railroad Administration's failure to provide a reasoned explanation for its approval of the materially altered engineer certification program administered by one of the railroads. As to that program approval, we agree with the Railroad Administration that it took final agency action and entered its decision, as required for jurisdiction to attach under the Hobbs Act, 28 U.S.C. §§ 2342(7), 2344. We also agree with the labor unions that their challenge to the approval was

timely, and that the Railroad Administration's wholly unexplained approval of material decisions directly affecting railroad safety was arbitrary and capricious. We dismiss the petition's remaining challenges for lack of jurisdiction.

**I**

**A**

**1**

Title 49 of the United States Code governs "Transportation." Subtitle V of Title 49 deals specifically with "Rail Programs[,]" and Part A of Subtitle V is dedicated to "Safety[.]" We deal in this case with Chapter 201 of Part A, which Congress enacted "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. To accomplish those goals, Congress directed the Secretary of Transportation, "as necessary," to "prescribe regulations and issue orders for every area of railroad safety[.]" *Id.* § 20103(a).

Congress's effort to increase rail safety included ensuring that only those locomotive engineers and train conductors who met federal training and safety standards could operate trains in the United States. To that end, Chapter 201 obligates the Secretary to "prescribe regulations and issue orders to establish a program requiring the * * * certification * * * of any operator of a locomotive," 49 U.S.C. § 20135(a), and "the certification of train conductors," *id.* § 20163(a).

Rather than charge the agency with certifying engineers and conductors itself, Congress placed the onus on each "railroad carrier[]" to develop and operate its own certification programs for the engineers and conductors it employs. *See* 49

U.S.C. §§ 20135, 20163. Congress then mandated that each railroad's certification program comply with minimum program requirements established by the Secretary, and that each program be individually approved by the Secretary. *See id.* §§ 20135, 20162–20163.

Congress defined a covered "railroad carrier" subject to those requirements as "a person providing railroad transportation, except that, upon petition by a group of commonly controlled railroad carriers that the Secretary determines is operating within the United States as a single, integrated rail system, the Secretary may by order treat the group of railroad carriers as a single railroad carrier[.]" 49 U.S.C. § 20102(3).

**2**

The Secretary has delegated to the Federal Railroad Administration the authority to "[c]arry out the functions and exercise the authority vested in the Secretary by ＊＊＊ Subtitle V," 49 C.F.R. § 1.89, including the authority to approve railroads' engineer and conductor certification programs.

In exercising its delegated authority, the Railroad Administration has promulgated regulations requiring "[e]ach railroad" to "have in effect a written program for certifying the qualifications of" both engineers and conductors. 49 C.F.R. § 240.101 (engineers); *id.* §§ 242.101–242.103 (conductors). Those programs must be approved and in effect "prior to commencing operations." *Id.*

A railroad's certification programs must ensure that the railroad's engineers and conductors satisfy baseline requirements set by the Railroad Administration in Part 240

5

(engineers) and Part 242 (conductors) of Title 49 of the Code of Federal Regulations. *See* 49 C.F.R. §§ 240.1, 242.1. Those regulatory requirements address such matters as the "eligibility, training, testing, certification and monitoring" of engineers and conductors. *Id.* For example, to be approved by the Railroad Administration, a railroad's engineer certification program must evaluate, among other things, an engineer's: (i) prior safety conduct, *id.* § 240.109; (ii) prior compliance with operating rules, *id.* § 240.117; (iii) history of substance abuse disorders and alcohol/drug rules compliance, *id.* § 240.119; (iv) visual and hearing acuity, *id.* § 240.121; (v) initial and continuing education, *id.* § 240.123; (vi) relevant knowledge, *id.* § 240.125; (vii) skill performance, *id.* § 240.127; and (viii) ongoing operational performance, *id.* § 240.129. *See id.* §§ 240.101(c), 240.203; *see also id.* §§ 242.101(a), 242.109 (requiring similar evaluations for conductor certification programs).

Each railroad must "submit its written certification program and a description of how its program conforms to the specific [regulatory] requirements" to the Railroad Administration "for approval at least sixty days before commencing operations." 49 C.F.R. § 240.103(a); *see id.* § 242.103(b).

The Railroad Administration does not issue any formal documentation approving a railroad's written certification program. Rather, the Railroad Administration has adopted a passive approval system. Under that scheme, if the Railroad Administration does not notify the railroad—in writing and within thirty days of submission—that the written certification program fails to meet the minimum regulatory criteria, then the program "is considered approved and may be implemented" by the railroad. 49 C.F.R. §§ 240.103(c), 242.103(g). The

Railroad Administration's regulations are explicit that "[n]o formal approval document [regarding certification program submissions] will be issued by the [Administration]." *Id.* § 240 App. B (engineer programs); *id.* § 242 App. B (conductor programs).

Any material modifications to a previously approved certification program must also be submitted for the Railroad Administration's approval either thirty days (engineer programs) or sixty days (conductor programs) before implementation. *See* 49 C.F.R. §§ 240.103(e), 242.103(i). Those modifications are likewise approved passively by the Railroad Administration if not explicitly rejected within thirty days after submission. *See id.* §§ 240.103(e)(3), 242.103(i)(3).

When a railroad submits an original or modified conductor certification program to the Railroad Administration, it must simultaneously serve a copy of its submission on the president of every labor organization that represents the railroad's employees who are subject to Part 242. 49 C.F.R. § 242.103(c)(1). There is no similar requirement for Part 240 engineer certification program submissions. *Cf.* 84 Fed. Reg. 20,472, 20,478 (May 9, 2019) (Notice of Proposed Rulemaking announcing an intention to make the duty to serve equivalent for engineer certification programs). Once the conductor submission is shared with the labor organization, however, there is no continuing duty on the railroad to notify the labor organizations when (and if) the Railroad Administration either approves or disapproves the conductor certification program. Nor does anything in the Railroad Administration's regulations provide for the agency to "publish or give notice of [a] certification [program] approval." Oral Arg. Tr. 20:23–21:1 (counsel for Railroad Administration).

To enforce compliance with the certification requirements, Railroad Administration regulations prohibit any person from operating a locomotive as an engineer or serving as a conductor unless that person has been certified by a railroad under a written program approved by the Administration. *See* 49 C.F.R. §§ 240.201(d), 242.105(f). Any certificate must, among other things, "[i]dentify the railroad or parent company that is issuing it[,]" and "[i]dentify the person to whom it is being issued[.]" *Id.* §§ 240.223(a), 242.207(a). Any person who violates Part 240 or Part 242 is subject to civil penalties and potential disqualification from future railroad service. *See id.* §§ 240.11, 242.11.

Any person may petition the Railroad Administration for a formal waiver of compliance with the engineer certification requirements of Part 240 or the conductor certification requirements of Part 242. *See* 49 C.F.R. §§ 211.7, 211.9, 240.9, 242.9; *see also* 49 U.S.C. § 20103(d)–(e). Such a waiver may be issued, subject to any conditions the Railroad Administration deems necessary, only upon a finding that a waiver is "in the public interest" and "consistent with railroad safety." 49 U.S.C. § 20103(d); 49 C.F.R. §§ 240.9(c), 242.9(c). Generally, before granting a petition for a waiver, the Railroad Administration must conduct a hearing that affords interested parties an opportunity to submit comments and to make an "oral presentation" of their views. 49 U.S.C. § 20103(e). If the Railroad Administration grants the waiver, it "shall make public the reasons for" doing so. *Id.* § 20103(d); *see also* 49 C.F.R. §§ 240.9, 242.9, 211.41.

**3**

In certain circumstances, Railroad Administration regulations permit a railroad's certification program to certify engineers or conductors who have not completed the railroad's

entire training regimen for new hires. As relevant here, 49 C.F.R. § 240.225 governs railroads' "[r]eliance on qualification determinations made by other railroads" of engineers, and 49 C.F.R. § 242.125 governs "[c]ertification determinations made by other railroads" of conductors. Together, they provide in relevant part:

> A railroad that is considering certification of a person as a qualified engineer [or conductor] may rely on determinations made by another railroad concerning that person's qualifications. The railroad's certification program shall address how the railroad will administer the training of previously uncertified engineers [or conductors] with extensive operating experience or previously certified engineers [or conductors] who have had their certification expire. If a railroad's certification program fails to specify how to train a previously certified engineer [or conductor] hired from another railroad, then the railroad shall require the newly hired engineer [or conductor] to take the hiring railroad's entire training program.

49 C.F.R. § 240.225(a); *see id.* § 242.125(a).

For a railroad to rely on another railroad's engineer certification, it must first determine that (i) the prior certification is still valid; (ii) the prior certification was for the same classification of service as the certification being issued; (iii) the person has received training on and visually observed the physical characteristics of the new territory; (iv) the person has demonstrated the necessary knowledge concerning the new railroad's operating rules; and (v) the person has demonstrated the necessary performance skills concerning the new railroad's operating rules. *See* 49 C.F.R. § 240.225(a); *see also id.*

§ 242.125(b) (imposing similar requirements for relying on another railroad's conductor certifications).

Other Railroad Administration regulations specifically provide that if a United States railroad "conducts joint operations with a Canadian railroad," the United States railroad may certify employees of the Canadian railroad based on those employees' satisfaction of Canadian regulatory requirements. *See* 49 C.F.R. §§ 240.227, 242.127; *see also id.* § 240.229 (permitting similar reliance for railroads conducting joint operations with other railroads); *id.* § 242.301 (similar).

There is no similar reciprocity provision for joint operations with Mexican railroads.

Finally, in addition to requiring railroads to train and certify the engineers and conductors whom they employ, the Railroad Administration's regulations also require railroads and their employees, among other things, to comply with standards for (i) the control of alcohol and drug use by employees, *see* 49 C.F.R. pt. 219; (ii) railroad communications, *see id*. pt. 220; (iii) hours of service, *see id.* pt. 228; and (iv) brake maintenance and testing, *see id.* pt. 232.

The Railroad Administration may issue waivers of compliance for any part of those regulations as well, subject to the same procedures for waivers of certification requirements. *See, e.g.*, 49 U.S.C. § 20103(d)–(e).

**B**

Kansas City Southern ("Southern Company") is a holding company that owns several railroads operating trains within North America. Collectively, those railroads operate rail lines that run from Mexico City, Mexico, across the United States–

Mexico border at Laredo, Texas, and throughout the United States.

Laredo sits on the northern bank of the Rio Grande River, which is part of the natural border between the United States and Mexico.  Trains crossing the border at Laredo enter or exit the United States by way of the International Bridge, which runs north–south over the Rio Grande.

Three of Southern Company's railroads—two that operate in the United States and one that has historically operated only in Mexico—are relevant to this case.

The two railroads that operate in the United States are Kansas City Southern Railway Company ("Kansas City Railway") and its wholly owned subsidiary Texas-Mexican Railway Company (collectively, "the Railroads").  The Railroads own tracks and operate trains on the United States side of the border at Laredo and into the interior of the United States.

Kansas City Southern de México ("de México Railway") is the Railroads' Mexican affiliate.  It operates the rail line that runs from Mexico City to Laredo, which provides exclusive rail access to the United States border crossing at Laredo from the Mexican side of the border.  The Railroads do not own or control de México Railway; they are simply affiliated with it.

Historically, de México Railway crews operated trains only in Mexico, and not in the United States.  De México Railway's operations in Mexico and up to the border did not require it to certify its engineers or conductors under a program approved by the Railroad Administration.

As a result of Mexico's and the United States' differing certification regimes, Southern Company trains that crossed the border at Laredo have long "interchanged" in the middle of the International Bridge. That is, rail cars were transferred from one railroad to another, and a new rail crew took over.

Specifically, southbound trains operated by the Railroads heading into Mexico stopped in the middle of the International Bridge so that de México Railway crews could recouple the rail cars and take them into Mexico. Northbound trains operated by de México Railway heading into the United States similarly stopped in the middle of the bridge so that the Railroads' crews could recouple the rail cars and take them into the United States. Those Railroads' crews would operate the northbound trains to Kansas City Railway's Laredo Train Yard, which is roughly 9.2 miles from the International Bridge. At the Train Yard, new crewmembers working for the Railroads would take the rail cars on their journeys elsewhere in the United States, while the disembarking crew would be shuttled back to the International Bridge to take over another northbound train.

The dedicated crews that operated the Railroads' trains back and forth on the 9.2-mile stretch of track between the border and the Laredo Train Yard were busy. They commonly operated hundreds of northbound and southbound trips every month along that route.

Those crewmembers are represented by two labor organizations: (i) the Brotherhood of Locomotive Engineers and Trainmen, a division of the Rail Conference of the International Brotherhood of Teamsters, and (ii) the Transportation Division of the International Association of Sheet Metal, Air, Rail and Transportation Workers (collectively, "the Unions").

## C

According to the Railroad Administration and a report by the Government Accountability Office, this longstanding practice of interchanging in the middle of the International Bridge caused problems on the storied streets of Laredo, *see, e.g.*, JOHNNY CASH, *Streets of Laredo*, *on* AMERICAN IV: THE MAN COMES AROUND (American Recordings & Universal Records 2002).

Specifically, stopping each train in the middle of the International Bridge to swap crews caused significant backups on highway–rail crossings in Laredo. Because the trains can be several miles long, a single one stopped on the bridge could stretch all the way to nearby Interstate 35, a major highway that runs through Laredo and intersects with the rail line. Trains were sometimes forced to sit on the bridge for long periods of time, waiting for a new crew to arrive and take over. For example, the Railroads' crews that delivered northbound trains from the border to the Laredo Train Yard were then driven back to the border to pick up the next northbound train, and they were sometimes delayed at the Train Yard or on the way back to the border by (ironically enough) bridge-induced traffic congestion. All things considered, crew changes on the bridge could sometimes take two to three hours.

On top of those crew change delays, when trains entered the United States from Mexico, the Railroads' crews that assumed control were generally required to perform what is known as a "Class I brake test." *See* 49 C.F.R. § 232.205(a)(1). Trains crossing the border are also subject to inspection by United States Customs and Border Protection and Mexico's customs agencies. Those brake tests and customs inspections added to Laredo's traffic gridlock.

**D**

Over the years, the Railroad Administration and the Railroads have tried to streamline the journey of trains over the International Bridge to reduce delays and traffic congestion.

First, in 2008, Kansas City Railway obtained from the Railroad Administration a formal waiver excusing the Railroads from having to perform a Class I brake test on the International Bridge. Instead, only a less time-consuming Class III brake test had to "be performed before departing the interchange point[.]" J.A. 141. *Compare* 49 C.F.R. § 232.211(b) (defining Class III brake tests), *with id.* § 232.205(c) (defining more rigorous Class I brake tests). The waiver required Class I brake tests to eventually be performed before the northbound trains departed the Laredo Train Yard.

Kansas City Railway's brake-test waiver was effective for a five-year period. But the Railroad Administration has twice extended the waiver, and it is still in effect today. *See* 83 Fed. Reg. 35,052 (July 24, 2018).

Second, the Railroads proposed a plan by which they would grant de México Railway operating rights over the 9.2 miles of track between the International Bridge and the Laredo Train Yard. As part of that plan, Kansas City Railway would certify de México Railway engineers and conductors through an abbreviated training program, given the de México employees' experience working in Mexico. Those certifications would allow de México engineers and conductors to operate north- and southbound trains inside the United States on that stretch of track. That meant the Railroads' crews would operate northbound trains only after they arrived at the Laredo Train Yard, and southbound trains no further than that point.

As for brake testing (which is required only of the northbound trains entering the United States), the plan provided that de México Railway crews would avail themselves of Kansas City Railway's existing waiver to skip the Class I brake test on the International Bridge. Kansas City Railway also petitioned the Railroad Administration for an additional brake-test waiver excusing performance of any brake test at all at the border. *See* 83 Fed. Reg. at 35,052–35,053.

On October 26, 2016, Kansas City Railway described its proposed crew change plan to a Railroad Administration official over email and asked for a meeting to discuss it. At the official's request, Kansas City Railway forwarded its draft plan, explaining that it was "not inclusive of everything that will need to take place, but [was] intended to start a dialogue." J.A. 44.

That draft plan—entitled "International Crew Pilot Program Draft Implementation Plan"—is dated October 27, 2016. J.A. 47. Its stated purpose is to identify "the steps for Certification, Qualification, and Operation for [Kansas City Railway's] vision of the International Crew Pilot Program" intended "to operate between border yards in Mexico and the United States without the need to stop on the International Bridge for any reason." J.A. 47. The draft plan describes de México Railway crew members as "experienced train operators that are certified to operating standards in Mexico," which, the draft asserted without elaboration or citation, "are similar to those required by" the Railroad Administration. J.A. 47. The Draft Plan added that de México Railway "crew members will be certified, to operate trains in the [United States], under [Kansas City Railway's] approved 49 C.F.R. [Parts] 240 and 242 submission." J.A. 47.

Appendix A to the Draft Plan, entitled "FRA Compliance Document," lists various parts of the Railroad Administration's regulations and "how [Kansas City Railway] will comply with information/audit requests from the" Railroad Administration. J.A. 50. In that regard, the Draft Plan points to, among other things, the regulations governing alcohol and drug use, railroad communications, hours of service limitations, and brake maintenance and testing.

Communications between the Railroads and the Railroad Administration about the proposed plan continued into 2017.

In June of that year, the Railroad Administration issued a public report stating that the Railroads had "spent the past three years attempting to" certify a group of de México Railway crew members to operate trains in the United States "in a manner that is acceptable from a regulatory standpoint, in which [the Railroad Administration] would approve Mexican train crew certifications without the need for a waiver" of safety regulations. A.R. 1774.

That same month, a staff member for Congressman Henry Cuellar, whose congressional district includes Laredo, emailed a Railroad Administration official about the proposed crew change procedures. The staff member inquired whether the Railroad Administration had or would be approving the new procedures and when they would take effect.

The Railroad Administration official forwarded the email internally. Another Railroad Administration official confirmed to his colleague that, in July 2018, de México Railway crews would indeed begin operating trains in the United States on the 9.2-mile stretch of track between the International Bridge and the Laredo Train Yard. J.A. 558–559.

The Railroad Administration official's internal email further noted that, under the new procedure, southbound trains would no longer have any reason to stop on the bridge (though they would "still proceed at 5 mph across the bridge to be x-rayed by [Customs and Border Patrol]"). J.A. 558. Finally, the official added that Kansas City Railway "currently operates under a waiver that requires them to stop at the bridge on northbound movements to conduct a [Class III] brake test," and that will "still be the case" under the new procedure. J.A. 559. That is, "[a]ll northbound trains [operated by de México Railway crews] will still be required to stop and conduct a [Class III] brake test" on the International Bridge. J.A. 559.[1] Finally, the official stated that the Railroad Administration had "done extensive inspections and review of the plan," and that "Mexican crews will be in compliance with all [Railroad Administration] regulations." J.A. 559.

On August 16, 2017, the Railroad Administration completed a self-described "audit" to determine whether Kansas City Railway could certify de México Railway engineers and conductors using an abbreviated curriculum within its certification programs. *See* J.A. 390–391.

In that audit, the Railroad Administration concluded that "no changes [were] necessary" to Kansas City Railway's five-year-old conductor certification program to allow it to certify de México Railway conductors. J.A. 390. The audit noted that

---

[1] The Railroad Administration subsequently denied Kansas City Railway's petition for a waiver of the obligation to perform a Class III brake test on the International Bridge. *See* 83 Fed. Reg. at 35,052–35,053 (petition for waiver); Letter, Docket No. 2007-28700 (Fed. R.R. Admin. March 8, 2019) (rejecting waiver petition).

Kansas City Railway's existing conductor certification program already included language tracking 49 C.F.R. § 242.125, which, the audit reasoned, allowed it "to train previously uncertified conductors with extensive operating experience." J.A. 390; *see also* J.A. 237–238 (Section 4 of Kansas City Railway's 2012 Part 242 program, entitled "Training, Testing and Evaluating Persons *Not* Previously Certified").

For Kansas City Railway's existing engineer certification program, however, the Railroad Administration determined that the railroad could not certify de México engineers under an abbreviated curriculum because some "added language to the engineer program" was necessary and "would need to be vetted * * * and approved by" Administration officials. J.A. 391. Namely, the audit called for language "explicitly address[ing] how [de México] engineers working into the [United States] would be trained and certified." J.A. 391. The Railroad Administration noted that Kansas City Railway had already developed language in consultation with an Administration official "to amend [its] program that would recognize the experience" of de México engineers and "allow [them] to be trained under an amended training program." J.A. 390. The intent of the added language was "to take advantage of the previously trained/experienced [de México] engineers and avoid having to start retraining from ground zero." J.A. 390. The audit added that a Railroad Administration attorney "would need time to determine if [the Administration] *could* recognize [de México Railway] engineers['] experience as being compatible with what we accept from other railroads in the United States." J.A. 391 (emphasis added). *But see* J.A. 391 (audit team noting that it "feels" full training "would be a disproportionate amount of training for [the] train movements into the United States"). The

audit team said nothing about the prospect of a railroad certifying engineers that it did not employ and who worked for a foreign affiliate that the domestic railroad did not claim to control. *See* J.A. 391.

Consistent with the results of that internal audit, which were not publicly released, Kansas City Railway did not revise its previously approved conductor certification program. But it did, on January 19, 2018, email to the Railroad Administration a revised engineer certification program.

The revised engineer certification program states that Kansas City Railway "will issue all required certificates for employees of its affiliate or subsidiary companies," including de México Railway. J.A. 520. The revised program also provides that "[e]ngineer candidates that work for a [Kansas City Railway] affiliate * * * in the capacity of Locomotive Engineer and have previous training on the railroad's operating and safety rules may receive an accelerated training curriculum based on their proficiency by a qualified engineer instructor." J.A. 519; *see also* J.A. 515 (section entitled "Initial Certification of Foreign Locomotive Engineers"); J.A. 519 (noting that "[a]ll international engineers will be kept on a separate roster from all [Kansas City Railway] locomotive engineers").[2]

---

[2] The audit notwithstanding, several subsequent Railroad Administration communications contemplated that Kansas City Railway was actually required to revise both its "240 [engineer] & 242 [conductor] submissions" to add a "new section" outlining "exactly how [it] plan[s] to train [its] new [de México Railway] engineers and conductors with previous experience." J.A. 394; *see*

Thirty days came and went, and Kansas City Railway received no communication from the Railroad Administration rejecting its revised Part 240 engineer certification proposal. As a result, the revised engineer certification program was passively approved by the Railroad Administration on February 19, 2018, and the Administration authorized Kansas City Railway to implement it. *See* 49 C.F.R. § 240.103(c). For good measure, the Railroad Administration sent an email four months later confirming to Kansas City Railway that its engineer certification submission had previously been approved.

A number of de México Railway crewmembers completed their training, medical examinations, background checks, drug and alcohol certifications, and field testing, and were certified under Kansas City Railway's modified engineer and existing conductor certification programs to operate trains in the United States.

**E**

The Unions have consistently opposed Kansas City Railway's efforts to certify de México Railway's crews to operate trains on the 9.2-mile stretch of track between the International Bridge and the Laredo Train Yard. In May 2018, Kansas City Railway informed the Unions that it would implement its new crew change procedure using de México Railway crews on July 9, 2018.

---

*also* J.A. 533. But there is no evidence that Kansas City Railway ever submitted a revised Part 242 program for certifying conductors. Nor does the record indicate that the Railroad Administration ever considered or approved a revised conductor certification program.

The Unions threatened to strike on that date, arguing both that the governing collective bargaining agreements did not permit the Railroads to move the interchange point unilaterally and that the use of de México Railway crews in the United States would violate Railroad Administration regulations.

Shortly thereafter, the Railroads filed suit in the United States District Court for the Southern District of Texas to enjoin the impending strike. *See Kansas City S. Ry. Co. v. Brotherhood of Locomotive Eng'rs & Trainmen*, No. 5:18-cv-00071, 2018 WL 7253969, at *1 (S.D. Tex. July 6, 2018). The Railroads argued that the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, mandated arbitration of the grievance and prohibited striking. *See id.*

At an evidentiary hearing in the Southern District of Texas litigation on July 3, 2018, Kansas City Railway's Vice President testified publicly about the Railroad Administration's non-public August 2017 audit and subsequent approval of the railroad's modified Part 240 engineer certification program. Specifically, he disclosed that Kansas City Railway had "developed a written plan" to certify de México Railway engineers and conductors, and "that the [Railroad Administration] audited[,] reviewed and accepted" those plans and concluded that they authorized Kansas City Railway "to certify [de México Railway] engineers and conductors to operate in the United States." Transcript of Motion Hearing at 68–69, *Kansas City*, 2018 WL 7253969 (No. 5:18-cv-00071), ECF No. 24.

On July 6, 2018, a few days before the new crew change procedure was set to begin, the district court granted the Railroads' motion for a preliminary injunction and enjoined the Unions from striking. *See Kansas City*, 2018 WL 7253969, at

*1, *4, *7. At the parties' joint request, the district court made the injunction permanent.

On July 9, 2018, the new crew change procedures were implemented, with de México Railway crews certified by Kansas City Railway operating trains for the first time on the 9.2-mile stretch of track between the International Bridge and the Laredo Train Yard. The Railroad Administration publicly participated in the rollout. *See* A.R. 2150 (Kansas City Railway document noting that Railroad Administration staff have "been in Laredo and activ[ely] participated in the program since launch"); *id.* (also noting that Railroad Administration "observers have ridden trains with" the de México Railway crewmembers and inspected trains at the Laredo Train Yard, where the Unions' members take over/disembark the affected trains).

**F**

On September 4, 2018, the Unions filed a petition for review with this court under the Hobbs Act, 28 U.S.C. § 2342, challenging what they labeled the Railroad Administration's decision to "authorize[] and permit[]" de México Railway "to operate freight trains * * * in Laredo" for Kansas City Railway in violation of applicable rail safety laws and regulations. Petition for Review at 1–3, No. 18-1235 (D.C. Cir. Sept. 4, 2018). Their petition targets "certain administrative orders and/or actions issued and/or taken" by the Railroad Administration "as arbitrary and capricious, an abuse of discretion, in excess of the [agency's] statutory authority and otherwise contrary to law." *Id.* at 1–2.

More specifically, the petition explains that it challenges, among other things, (i) the Railroad Administration's "authorization" of "the training, testing and certification of [de

México Railway's] non-U.S. locomotive engineers and conductors," and (ii) "the implementation of [de México Railway's] operations taking place in Laredo, Texas on or after July 9, 2018, including participation, monitoring and/or observation by [Railroad Administration] personnel." Petition at 3.

As to the Railroad Administration's approval of Kansas City Railway's modified engineer program—which allowed the railroad to certify de México Railway engineers under an abbreviated training curriculum—the Unions argue that the approval must be set aside for two reasons.

First, the Unions contend that, under the relevant statutes and regulations, it was unlawful to approve a certification program permitting one railroad to certify employees of a foreign affiliate railroad that it does not control. In the Unions' view, de México Railway must operate its own approved engineer certification program for its crews to operate in the United States. *See* Unions Br. 5–7, 13, 35–39; Unions Reply Br. 20–22.

Second, the Unions dispute whether a certification program may deploy an abbreviated curriculum and training protocol to engineers with operating experience only in Mexico, where they are governed by a different regulatory regime, and lacking any prior certification in the United States. *See* Unions Br. 39; Unions Reply Br. 23.

The Unions did not attach the challenged Railroad Administration decisions or orders to their petition. Instead, they explained that the relevant agency "actions have been taken * * * without public notice or other published documentation," leaving the Unions "unable to cite or attach a copy of a formal [Administration] order, waiver, or other

Agency decision." Petition at 3. The Unions then assert, on information and belief, that the Railroad Administration "maintains internal records reflecting and/or relating to the Agency's authorization [of] and permission" for the challenged actions. *Id.*

The Railroads intervened in support of the Railroad Administration. Both the Railroad Administration and the Railroads moved to dismiss the Unions' petition for lack of jurisdiction, contending that it failed to identify and timely challenge any final agency action of the Railroad Administration subject to judicial review.

That motion to dismiss and the merits of the Unions' petition are now before us.

## II

We determine *de novo* whether we have jurisdiction under the Hobbs Act, 28 U.S.C. § 2342. *See Blue Ridge Envtl. Defense League v. Nuclear Regulatory Comm'n*, 668 F.3d 747, 753 (D.C. Cir. 2012).

Congress subjected "final action of the Secretary of Transportation" under the statutory provisions at issue here to judicial review exclusively under the Hobbs Act. *See* 49 U.S.C. § 20114(c); *see also* 28 U.S.C. § 2342(7) (jurisdiction over "final agency actions" under 49 U.S.C. § 20114(c)). Included in that jurisdictional grant are final actions taken by the Railroad Administration under Chapter 201 of Title 49. *See Daniels v. Union Pac. R.R. Co.*, 530 F.3d 936, 940–941 (D.C. Cir. 2008); *see also* 49 C.F.R. § 1.89 (Secretary of Transportation's delegation of authority under Chapter 201 to the Railroad Administration).

The Hobbs Act, in turn, invests federal courts of appeals (other than the Federal Circuit) with "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" such final agency actions. 28 U.S.C. § 2342(7). To invoke a court of appeals' jurisdiction under the Hobbs Act, a "party aggrieved" by the agency's action must file a petition for review within sixty days of "entry" of the relevant agency decision. 28 U.S.C. § 2344; *see id*. § 2342. The Hobbs Act separately commands a covered agency, upon entering a final and reviewable order, to "promptly give notice thereof by service or publication in accordance with its rules." *Id.* § 2344.

The Hobbs Act's requirements that the agency action be final and that the petition timely filed are jurisdictional. *See Blue Ridge*, 668 F.3d at 753 (finality requirement); *see also Western Union Tel. Co. v. FCC*, 773 F.2d 375, 376 (D.C. Cir. 1985) (timeliness requirement).

Applying those terms, we have jurisdiction to review the Unions' challenge to the Railroad Administration's final action approving Kansas City Railway's revised engineer certification program, allowing that railroad to certify for the first time de México Railway engineers under an abbreviated training curriculum. As the Railroad Administration agrees, its approval of that program constituted a final and reviewable order under the Hobbs Act. And the Unions have timely challenged it. But we lack jurisdiction over the Unions' other claims.

**A**

We begin with the question of our jurisdiction over the Unions' challenge to the approval of Kansas City Railway's modified engineer certification program.

**1**

As to the question of finality, the Railroad Administration's approval of Kansas City Railway's revised engineer certification program is a final agency action reviewable under the Hobbs Act, 28 U.S.C. §§ 2342(7), 2344.

Agency actions qualify as final if they "mark the consummation of the agency's decisionmaking process" and "legal consequences" flow from them. *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted); *see also Blue Ridge*, 668 F.3d at 753 ("An order is final" for purposes of the Hobbs Act "if it imposes an obligation, denies a right, or fixes some legal relationship, usually at the consummation of an administrative process.") (formatting modified). The Railroad Administration's passive approval of Kansas City Railway's revised Part 240 engineer certification program fits that bill.

*First*, the Railroad Administration's judgment allowing the revised program to go into operation assuredly had fixed legal consequences. By regulation, the revised certification program could not be implemented without the Railroad Administration's approval. *See* 49 C.F.R. § 240.103(a), (c), (e); *see also* 49 U.S.C. § 20135. As such, the approval made it lawful for Kansas City Railway to, for the first time, certify de México Railway engineers through an abbreviated training curriculum, and it permitted the engineers who received those certificates to operate trains within the United States. So it was an action "from which legal consequences [flowed]" and legal rights changed. *Bennett*, 520 U.S. at 178 (internal quotation marks omitted).

Of course, the Railroad Administration's approval took the form of inaction—its declination to intervene—rather than

the affirmative issuance of an order. But that decision not to act, by virtue of the Railroad Administration's regulatorily prescribed passive-approval scheme, naturally had the same legal effect regarding the rights and obligations at issue as if the Administration had formally stamped "Approved" on Kansas City Railway's submission. *See* Oral Arg. Tr. 17:18–21 (Q: "And if you don't do anything, then on, shall we say the 31st day, [it is as] if [the agency] stamped approved on there[?]" Railroad Administration: "Yes[.]"). The particular form that the agency's final approval took did not change the "direct and appreciable legal consequences" that flowed from it. *California Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 640 (D.C. Cir. 2019).

Nor is the idea that a document can take full and final legal effect if not rejected within a predetermined period of time a concept unknown to law. *See, e.g.*, U.S. CONST. Art. I, § 7, cl. 2 ("If any Bill [passed by the House of Representatives and the Senate] shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it[.]").

*Second*, the Railroad Administration's decision to allow the certification program to go into operation marked the consummation of the agency's decisionmaking process. The Administration has said so by regulation. *See* 49 C.F.R. § 240.103(c) ("A railroad's program is considered approved *and may be implemented* thirty days after the required filing date (or the actual filing date) unless the Administrator notifies the railroad in writing that the program does not conform to the criteria" of Part 240.) (emphasis added). Lest there be any doubt, the Railroad Administration is explicit that it will not issue a "formal approval document[.]" *Id.* § 240 App. B. By

regulation, the completion of the thirty-day period without objection itself marks the program's formal and final approval. And that approval legally authorizes the railroad to implement its program, *id.* § 240.103(c), in full compliance with the regulatory obligation to have a certification "program in effect prior to commencing operations" that has been "approved in accordance with § 240.103," *id.* § 240.101(b)–(c). Put simply, once the passive approval took effect, there was nothing more for the agency to review or resolve. Its decisionmaking process was at an end. *See California Cmtys.*, 934 F.3d at 636 (What "can only reasonably be described as [an agency's] last word" on a question "marks the consummation of [its] decisionmaking process.") (formatting modified).

And while we must independently evaluate our jurisdiction, *see Blue Ridge*, 668 F.3d at 753, it bears noting that the Railroad Administration agrees that its regulatorily prescribed tacit approval of Kansas City Railway's modified Part 240 engineer certification program was final agency action reviewable under the Hobbs Act. *See* Railroad Admin. Supp. Br. 3 ("The Agency's approval of the modified engineer certification program is a reviewable final agency action[.]"); Oral Arg. Tr. 32:22–33:15.

*Third*, though the practice leaves much to be desired, we also agree with the Railroad Administration that the absence of a written memorialization by the agency does not defeat finality. Congress empowered this court to review "final agency actions" of the Railroad Administration. *See* 28 U.S.C. § 2342(7); 49 U.S.C. § 20114(c); *see also Daniels*, 530 F.3d at 940–941; *see also id.* at 944 n.13 (holding that final agency action under 28 U.S.C. § 2342(7) "includes the [Railroad Administration's] administration of the locomotive engineer certification program") (citations omitted). Agency action

generally need not be committed to writing to be final and judicially reviewable. *See Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 930–931 (D.C. Cir. 2008) (reviewing as final agency action under the Administrative Procedure Act an unwritten policy that, "[o]n this record[,] it is clear the Commission" adopted); *see also Blue Ridge*, 668 F.3d at 753 (looking to cases "address[ing] the requirement of finality under the Administrative Procedure Act, 5 U.S.C. § 704," when analyzing finality under the Hobbs Act); *Atchison, Topeka & Santa Fe Ry. Co. v. Peña*, 44 F.3d 437, 441 (7th Cir. 1994) (en banc) ("Because it appears that 'final agency action'" in 28 U.S.C. § 2342(7) "carries the same meaning as it does in the Administrative Procedure[] Act, 5 U.S.C. § 704, we will apply the same standards applicable to the APA.") (citation omitted), *aff'd sub nom. Brotherhood of Locomotive Eng'rs v. Atchison, Topeka & Santa Fe R.R. Co.*, 516 U.S. 152 (1996).

In any event, under this scheme, there is a relevant written document:  Namely, the railroad's written submission that itself, upon the passage of thirty days, becomes the agency's approved program.  49 C.F.R. § 240.103(c).

**2**

Section 2344 of Title 28 also requires that the agency make an "entry of a final order[.]"  28 U.S.C. § 2344.  The Railroad Administration admits that, under its passive approval process, the agency "entered" its decision formally approving Kansas City Railway's modified engineer certification program on the day that marked the passage of the thirty-day review period. *See* Oral Arg. Tr. 32:22–33:7.  We agree.

To start with, we look to the agency's governing statutes and regulations to determine when a final decision has been entered. *See Western Union*, 773 F.2d at 376–378

(determining when an FCC order is "deemed to be 'entered' for purposes of § 2344" by turning to the FCC's governing statutes and regulations). For the Railroad Administration, that point of entry is when its regulations mark the certification program as "approved" and—most critically—allow it to take legal effect and to be "implemented" by the submitting railroad. 49 C.F.R. § 240.103(c). Under the Railroad Administration's distinctive passive approval scheme, in which no formal approval document is issued or filed, that conclusive authorization and formal vesting of legal rights in the railroad satisfies the Hobbs Act's "entry" requirement.

To be sure, most agencies subject to the Hobbs Act have adopted more formalized measures of "entry" that must occur before jurisdiction attaches. *See Western Union*, 773 F.2d at 377–378 (petition for review filed before entry of final FCC order was premature and did not establish jurisdiction because the FCC statute and implementing regulation explicitly tied "entry" to "publication in the Federal Register") (some capitalization omitted) (citing 47 U.S.C. § 405 (1982); 47 C.F.R. § 1.4(b) (1984)); *see also* Dissent Op. at 5–6 (noting that "most agencies * * * sensibly comply with their Hobbs Act obligations") (citing examples). That is perhaps a byproduct of the fact that the Hobbs Act explicitly limits courts' jurisdiction over all *other* agencies to their "final *orders*," *rules*, or *regulations*. *See* 28 U.S.C. § 2342(1) (emphasis added) (vesting jurisdiction over specified "final orders of the [FCC]"); *id.* § 2342(2) ("final orders of the Secretary of Agriculture"); *id.* § 2342(3) ("all [specified] rules, regulations, or final orders of" the Secretary of Transportation and the Federal Maritime Commission); *id.* § 2342(4) (specified "final orders of the Atomic Energy Commission"); *id.* § 2342(5) ("all [specified] rules, regulations, or final orders of the Surface Transportation Board"); *id.* § 2342(6) (all

specified "final orders under section 812 of the Fair Housing Act").

But the Hobbs Act speaks differently about review of Department of Transportation decisions involving railroad safety (including those of the Railroad Administration, 49 C.F.R. § 1.89). That later-added portion of the Hobbs Act more broadly empowers courts to review "all final agency *actions*[.]" 28 U.S.C. § 2342(7) (emphasis added); *see* 49 U.S.C. § 20114(c) (same); *see also* Rail Safety Enforcement and Review Act, Pub. L. No. 102-365, § 5(c), 106 Stat. 972, 975 (1992) (adding subsection 7 to 28 U.S.C. § 2342); *Atchison*, 44 F.3d at 441.

Recognizing, as the Railroad Administration agrees (Oral Arg. Tr. 32:22–33:7), that its passive final approval was entered upon the passage of the thirty-day approval period, then the agency's endorsement of the plan and the agency's conferral of new legal rights on the railroad falls within Section 2342(7)'s comprehensive coverage of Railroad Administration "actions" dealing with railroad safety. The form that an act of "entry" takes in any particular case is very much a product of agency regulations and procedures for formalizing in agency records the adoption of a final decision. *See Western Union*, 773 F.2d at 376–378. As a result, nothing in the Hobbs Act requires that entry involve publication or a special form of internal documentation. Indeed, the text of Section 2344 itself makes plain that "entry" and "notice thereof by service or publication" can be two distinct steps in the agency's process. 28 U.S.C. § 2344.

Entry, in other words, depends on context. And under the unusual passive scheme at issue here, entry occurs when the document submitted by the railroad as a proposal transmogrifies into an agency-approved program conferring

new rights or authority on the railroad. That, for all practical intents and purposes, is the date a railroad's proposal is designated "approved" by the Railroad Administration and agency regulations make the railroad aware of the agency's official sanction. *Cf. Energy Probe v. Nuclear Regulatory Comm'n*, 872 F.2d 436, 438 (D.C. Cir. 1989) (Under Nuclear Regulatory Commission regulations, "the date of 'entry,' which commences the running of the sixty-day period for filing for review under the Hobbs Act, is the date on which the agency's final decision is signed and served.").

A contrary conclusion, under which agencies could take undisputedly final actions with concrete legal consequences and yet evade judicial review just by declining to formally paper them internally, would create an agency-controlled end-run of the Hobbs Act. The text enacted by Congress gives no quarter to such manipulation. And the well-established "principle of statutory construction"—"the presumption favoring judicial review of administrative action[]"—counsels strongly against reading it into the text. *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069 (2020) (That "strong presumption" requires courts to, where feasible, adopt a reading of a statute "that accords with" the "basic principle[] that executive determinations generally are subject to judicial review.") (internal quotation marks omitted); *see also SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1359 (2018) (noting "the strong presumption in favor of judicial review").

In sum, we agree with the parties that finality and entry have been established. While the Railroad Administration's passive approval process is less common than affirmative forms of agency signoff, the Hobbs Act's provision for review of all "final agency actions" by the Railroad Administration encompasses such decisions. The agency's decision had

material and operative legal consequences, and its entry of that order marked the end of the administrative road, licensing Kansas City Railway to materially change its operations. That entry of approval also transformed what before had been just the Kansas City Railway's proposed document into a program bearing the Railroad Administration's imprimatur of approval.

**3**

**a**

The Unions' challenge to the Railroad Administration's approval of the revised Part 240 engineer certification program is also timely.

The Hobbs Act imposes distinct obligations on both the agency and the party seeking judicial review that affect the time for filing a petition. Understanding how those duties fit together is key to determining the timeliness of the Unions' challenge.

As relevant here, the Hobbs Act provides:

> On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies.

28 U.S.C. § 2344.

So the first requirement under the Hobbs Act, once a final order is entered, falls on the agency's shoulders: It must "promptly give notice thereof by service or publication in

accordance with its rules."  28 U.S.C. § 2344; *see Public Citizen v. Nuclear Regulatory Comm'n*, 901 F.2d 147, 153 (D.C. Cir. 1990) (noting the Hobbs Act's "requirement that agencies promptly give notice of their final orders by service or publication") (citing 28 U.S.C. § 2344).

The second duty under the Hobbs Act falls on the aggrieved party seeking judicial review.  That party must, "within 60 days after [the final order's] entry, file a petition to review the order" in the appropriate court of appeals.  28 U.S.C. § 2344.  The obligation to file within that sixty-day window "is jurisdictional in nature, and may not be enlarged or altered by the courts," *Energy Probe*, 872 F.2d at 437 (internal quotation marks omitted), at least absent "exceptional" circumstances, *JEM Broadcasting Co. v. FCC*, 22 F.3d 320, 325 (D.C. Cir. 1994); *id.* at 326 ("[W]e have recognized exceptions to the limitations period[.]"); *see RCA Global Commc'ns, Inc. v. FCC*, 758 F.2d 722, 730 (D.C. Cir. 1985); *see also Matson Navigation Co. v. Department of Transp.*, 895 F.3d 799, 804 (D.C. Cir. 2018) (noting that the Hobbs Act's limitations "period can be tolled by the timely filing of a [permissible] motion to reconsider") (internal quotation marks omitted).

When an agency publicly issues orders memorializing its final actions, that satisfies the agency's statutory duty of providing prompt public notice of entry and generally makes calculation of the time for filing petitions for review easy.  In that context, "the date of 'entry,' which commences the running of the sixty-day period for filing for review under the Hobbs Act, is the date on which the agency's final decision is signed and served" or published, *Energy Probe*, 872 F.2d at 438. *See also Grier v. Department of Housing & Urban Dev.*, 797 F.3d 1049, 1054 (D.C. Cir. 2015) (similar); *Western Union*, 773 F.2d at 376–378.  If the aggrieved party fails to file

a petition for review within the ensuing sixty days, the window for judicial review will close.  *See Energy Probe*, 872 F.2d at 438.

Difficulties arise, though, when the agency internally enters a final order but fails to provide the statutorily required prompt public notice of that entry.  Must petitioners be locked out of the courts for failing to file their challenges within sixty days of an unknown and secret agency act of entry— notwithstanding the Hobbs Act's clear prohibition on such agency behavior?

That is the problem we confront here.  The Railroad Administration's entirely passive approval system already presents significant challenges for aggrieved parties to establish the finality of its orders, albeit ones that the Unions were able to hurdle in this case.  Yet this agency has made a bad situation worse by completely abdicating its legal duty to give prompt public notice of a passively approved final order's entry—or even to establish rules for the provision of such public notice.  Both of which the Hobbs Act plainly mandates. 28 U.S.C. § 2344; *Public Citizen*, 901 F.2d at 153; *contrast* Oral Arg. Tr. 22:14–19 (Railroad Administration agreeing that the approval "[w]as not made public"); *id.* 20:23–21:1 (Railroad Administration agreeing that its regulations do not provide for it to "publish or give notice of * * * certification approval[s]").

Nor does the Railroad Administration provide public notice when it disapproves a proposal.  *See* 49 C.F.R. § 240.103(c) (contemplating that disapprovals will be sent only to "the [submitting] railroad in writing").  So while the submitting party may be informed of the negative decision, no one else is.  As a result, no inference of approval can reasonably be drawn from agency silence.  Either way, the

Railroad Administration's regulatory scheme shields its final decisions from public view.[3]

Because of the Railroad Administration's wholesale abandonment of its duty to formally serve or publish what it agrees was a reviewable final and entered order, or even to provide a known regulatory framework for the entry of its approval decisions, the agency afforded the Unions—and the public at large—no notice of the important and consequential action it took when it approved Kansas City Railway's plan for the abbreviated training and certification of de México Railway engineers.

Instead, the Unions first learned from the Railroad Administration that the agency had approved Kansas City Railway's revised engineer certification program on July 9, 2018, when the Unions witnessed Kansas City Railway put the crew changes into effect "with [the Administration]'s presence and support." Unions Supp. Reply Br. 6; A.R. 2150; *see* 49 C.F.R. § 240.101 (requiring each railroad to have an approved

---

[3] Strikingly, the Railroad Administration's approval process is so cryptic that it seems to have befuddled itself in this case. While the Administration argues (without citation to the record) that its order of approval was entered and the clock for filing started to run on January 31, 2018, Railroad Admin. Br. 16; Railroad Admin. Supp. Br. 3–4, the record indicates that Kansas City Railway submitted its revised Part 240 program via email on January 19, 2018, A.R. 2083, despite the fact that the submission document itself is dated January 1, 2018, A.R. 2047. So it would seem that the Railroad Administration's passive approval actually occurred after thirty days had passed from the date of the email submission—that is, on February 19, 2018. *Compare* 49 C.F.R. § 240.103(c), *with* Railroad Admin. Supp. Br. 3–4.

certification program "in effect prior to commencing operations"); *see also* 49 U.S.C. § 20135. And the Unions diligently filed their petition for review on September 4, 2018, within sixty days of the agency's public rollout of its approval and support.

The Unions did hear a few days earlier, on July 3, 2018 (during the Southern District of Texas litigation), that the Railroad Administration had approved the revised engineer program. *See* Transcript of Motion Hearing, *supra*, at 68–69. But that claim did not come from the Railroad Administration—the entity statutorily tasked with making the entry that opens the petition-for-review window, 28 U.S.C. § 2344. It came only from Kansas City Railway's Vice President, during a motion hearing. *See* Transcript of Motion Hearing, *supra*, at 68–69. Nor was the Railroad Administration even a party to that litigation. Regardless, the Unions' petition for review was also filed within sixty days of that disclosure.[4]

The Railroad Administration separately asserts that the Unions personally learned of the approval no later than June

---

[4] By the calendar, the petition was filed on the sixty-second day from the July 3, 2018 disclosure. But the Sunday (sixtieth day) and Monday (sixty-first day) of the Labor Day weekend do not count in calculating the review period. *See* FED. R. APP. P. 26(a)(1)(C) ("[I]f the last day [of the statutory review period] is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday.") Accordingly, the petition is timely whether measured from July 3rd or July 9th of that year, and we need not resolve whether the earlier disclosure on July 3rd was sufficient to open the filing window regarding the Railroad Administration's approval.

27, 2018, pointing to a letter from the Unions to Kansas City Railway on that date. *See* Railroad Admin. Br. 6. But that letter states only that the Unions have "review[ed] * * * the revised Part 240 Locomotive Engineer Certification Program" submitted to it by the *Railway*, and consider it to have "several glaring deficiencies in the requirements for foreign national locomotive engineers[.]" Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Temporary Restraining Order and/or Preliminary Injunction at Exhibit 9, *Kansas City*, 2018 WL 7253969 (No. 5:18-cv-00071), ECF No. 7-9. The letter provides no hint that the Unions knew that the Railroad Administration itself had actually approved Kansas City Railway's program.

All in all, the parties agree that the agency gave notice of the entry of its approval decision sufficient to open the jurisdictional window for filing a petition for review no later than July 9, 2018—the date de México engineers began driving trains in the United States under the watching and "support[ing]" eyes of the Railroad Administration, Unions Supp. Reply Br. 6; A.R. 2150. Given that agreement, we need not determine under what other particular and likely rare circumstances an agency's public actions alone will open the Hobbs Act's filing window. It suffices to say that the Unions' petition was timely because it was filed within sixty days of the Railroad Administration's public rollout of its final approval of the new engineer certification program.

**b**

The Railroad Administration sees the timeliness issue differently. Having completely hidden its already obscured passive approval from public view, the Railroad Administration argues that the Unions' petition for review is untimely because it was not filed within sixty days of the final

approval's entry on February 19, 2018.  As noted, that date was more than four months before the agency gave any public indication of its action that could have alerted the Unions of the approval's existence and entry.  As the Administration would have it, by dropping the ball, it has successfully hidden the ball from judicial review.

But that is not how the Hobbs Act works.  "[B]efore any litigant reasonably can be expected to present a petition for review" under the Hobbs Act, "he first must be put on fair notice" of the reviewable agency action's existence.  *Public Citizen*, 901 F.2d at 153.  So even "[]though the Hobbs Act's limitations period is "jurisdictional, * * * self-evidently the calendar does not run until the agency has decided a question in a manner that reasonably puts aggrieved parties on notice of" the challenged agency action. *RCA Global Commc'ns*, 758 F.2d at 730); *see JEM*, 22 F.3d at 326 (same); *cf. Grier*, 797 F.3d at 1053–1054 (Where an agency's regulations do not establish when an order is "entered" for purposes of a jurisdictional statute, it is "untenable" for it to argue that the limitations period began when the order was signed but not served, because that "would permit an agency to shorten a would-be petitioner's review period by delaying service[.]") (relying on cases construing "entry" under the Hobbs Act).

This is not the first time an agency has flouted the Hobbs Act's notice-upon-entry requirement and then asked us to dismiss a petition as jurisdictionally time-barred.  In *Public Citizen*, the Nuclear Regulatory Commission ignored the Hobbs Act's "requirement that agencies promptly give notice of their final [reviewable] orders by service or publication," and instead "mere[ly] place[d] a decision in [the] agency's public files, without any other announcement[.]"  901 F.2d at 153.  We rejected the Commission's argument that such

"placement" was sufficient to "start the clock running for review[.]" *Id.* "Potential petitioners," we reasoned, "cannot be expected to squirrel through the Commission's public document room in search of papers that might reflect final agency action." *Id.*

The Hobbs Act instead imposes a sixty-day "filing window" rather than "a filing deadline," *Western Union*, 773 F.2d at 377, and we have repeatedly held that the filing window does not open until the agency "put[s] aggrieved parties on reasonable notice of the" action they seek to challenge, *JEM*, 22 F.3d at 326 (citing *Eagle-Picher Indus. v. EPA*, 759 F.2d 905, 911–915 (D.C. Cir. 1985); and *RCA Global Commc'ns*, 758 F.2d at 730).

Of course, agencies subject to the Hobbs Act can by regulation combine the distinct "entry," contemplated for jurisdiction to attach, and the separately mandated public notice. The FCC, for one, has done just that. 47 C.F.R. § 1.103(b) ("Commission action shall be deemed final, for purposes of seeking * * * judicial review, on the date of public notice," which is "publication in the Federal Register," *id.* § 1.4(b)(1)). When an agency does so, the filing of a petition for review before such publication is premature and does not confer jurisdiction, because the agency decision, by definition, is not "final" and entered within the meaning of the Hobbs Act. *See Council Tree Commc'ns, Inc. v. FCC*, 503 F.3d 284, 287–290 (3d Cir. 2007); *Western Union*, 773 F.2d at 376–377.

This, however, is the unusual case where an agency has, without public knowledge, taken an action that is both final and entered, but for which its regulations provide no notice by service or publication, in direct violation of the Hobbs Act's commands. Because (as the Railroad Administration agrees) the Unions' petition was filed after the Railroad

Administration's approval was finalized and entered, it was not filed too early.

Neither was the petition filed too late. As noted, while the sixty-day period is jurisdictional, *Western Union*, 773 F.2d at 377, that clock does not start running prior to the agency giving "fair notice" of the entry of its action. *Public Citizen*, 901 F.2d at 153 (unnoticed final agency action cannot "start the clock running for review, particularly in view of the Hobbs Act's requirement that agencies promptly give notice of their final orders by service or publication, 28 U.S.C. § 2344"); *RCA Global Commc'ns*, 758 F.2d at 729–731; *JEM*, 22 F.3d at 326 (collecting cases).

By virtue of the Railroad Administration's presence and support, in the company of the Unions, at Kansas City Railway's public rollout of the approved crew changes on July 9, 2018, the Unions explain that the Railroad Administration's actions alerted them to the agency's final approval and entry of the Railway's modified engineer certification program.

To be clear, it is doubtful that the Unions' observation of the Railroad Administration's on-the-scene actions constituted the formal, *statutorily required* public notice under the Hobbs Act. But the only question here is whether *Public Citizen*'s fair-notice-of-entry requirement for opening the jurisdictional window to file a petition for review of hidden agency action was satisfied, 901 F.2d at 153. On these unusual facts—and in particular because of the agency's unique, entirely passive approval construct—we accept the parties' agreement that the Railroad Administration going public with its approval of and support for the revised engineer certification program in the presence of the Unions on July 9, 2018, opened the filing window. And this petition was filed within sixty days of that date.

**4**

The dissenting opinion agrees that the Railroad Administration's approval of Kansas City Railway's revised engineer program constitutes final agency action that was entered (albeit in an unreasonable manner, given the non-public nature of the entry). *See* Dissent Op. at 1–3. Nonetheless, the dissenting opinion argues that we lack jurisdiction over the agency's enshrouded final approval solely because the Railroad Administration subsequently defied the Hobbs Act's mandate that it promptly give formal notice by service or publication of its entry. *See* Dissent Op. at 3. The dissenting opinion contends that the consequence of the agency's secrecy and failure to give notice did not simply "delay[] the filing period[,]" but also "invalidated the jurisdictional effect of the approval's entry," wholly insulating the agency action from judicial review. Dissent Op. at 3.

But nothing in the Hobbs Act supports elevating the agency's independent discharge of its formal notice duty to a freestanding jurisdictional prerequisite in that way.

Even when a statutory requirement sits in the company of other jurisdiction-conferring provisions, mere proximity alone will not make it jurisdictional. *Gonzalez v. Thaler*, 565 U.S. 134, 147 (2012) ("Mere proximity will not turn a rule that speaks in nonjurisdictional terms into a jurisdictional hurdle."); *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 155 (2013) (similar). Rather, courts will treat statutory elements as jurisdictional only if "the Legislature clearly states that a threshold limitation * * * shall count as jurisdictional[.]" *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515 (2006); *Kaplan v. Central Bank of the Islamic Republic of Iran*, 896 F.3d 501, 512 (D.C. Cir. 2018).

For example, in *Gonzalez*, the Supreme Court looked at the certificate of appealability requirement in the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2253, subsection by subsection and then paragraph by paragraph to parse out which components are jurisdictional and which are not. 565 U.S. at 140–148 (holding that 28 U.S.C. §§ 2253(a), 2253(b), and 2253(c)(1) are jurisdictional, but Section 2253(c)(3) is not).

In the Hobbs Act, the obligation on the agency to promptly give notice of or to publish the final order upon entry appears in a standalone sentence at the beginning of the statutory section: "On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules." 28 U.S.C. § 2344. Notice, service, and publication are not mentioned again in Section 2344. Congress, in other words, placed no "clear jurisdictional label" on the separate statutory duty of the agency to provide prompt notice of its final, entered orders, nor did it otherwise hinge jurisdiction on the agency's compliance. *Kaplan*, 896 F.3d at 512 (quoting *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 162 (2010)).

Rather, it is the next sentence that packs the jurisdictional punch. It specifically conditions the availability of judicial review on (i) a final order, (ii) its entry, and (iii) the aggrieved party filing its petition in the appropriate court of appeals within a sixty-day window. 28 U.S.C. § 2344 ("Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies."); *Western Union*, 773 F.2d at 377 (Section 2344 establishes a sixty-day "filing window," not "a filing deadline").

43

To be sure, Congress presupposed that agencies would comply with the public notice or service command of the first sentence so that the jurisdictionally required "entry" would be proximate to the notice necessary to file a petition. And where agencies issue formal orders that are signed and served, such orders are deemed "entered" that day, ensuring that those subject to the orders have fair notice of the opening of the filing window. *Energy Probe*, 872 F.2d at 438; *Grier*, 797 F.3d at 1054. After all, without the agency providing notice of its decision, how else would affected parties even know they are aggrieved? But that does not make the agency's provision of post-entry notice itself a jurisdictional element.

Also of jurisdictional note, the obligation to provide notice is not "a burden that" the parties affected by agency action "bear[.]" *Gonzalez*, 565 U.S. at 144. The petitioning party, who "may have done everything required of him by law," has "no control over" the agency's nonfeasance. *Id.* Nothing in the statutory text or structure supports assigning jurisdictional consequence to the petitioner's agency-induced haplessness. And the "strong presumption" in favor of judicial review weighs heavily against making the agency's flouting of a statutory requirement the very instrument for locking the agency's challengers out of court. *See Guerrero-Lasprilla*, 140 S. Ct. at 1069.

The dissenting opinion points to the Supreme Court's recent decision in *Rotkiske v. Klemm*, 140 S. Ct. 355 (2019), as support for the general proposition that courts should not rewrite statutory limitations periods to include an across-the-board discovery-rule limitation that Congress did not enact. *See* Dissent Op. at 2. We agree. But this case is about the provision of *statutorily required agency notice* of its action, not plaintiffs' *discovery of their injury* caused by an asserted legal

error in that agency action. Contrary to the dissenting opinion's assumption (Dissent Op. 2–3), those are not the same things.

Plus, the Supreme Court in *Rotkiske* expressly left open the "application of equitable [tolling] doctrines[.]" 140 S. Ct. at 361 n.3. That would seem to include the very reasonable notice principle adopted by this court in *Public Citizen*, endorsed by the dissenting opinion (at 3–4) and applied here, where an agency has openly flouted its statutory duty to provide formal notice of its indiscernible, entirely passive, and unwritten entry process.

More specifically, in *Rotkiske*, the Supreme Court declined to read the limitations period in the Fair Debt Collection Practices Act that permitted certain suits to "be brought * * * within one year from the date on which the [statutory] violation occurred," 15 U.S.C. § 1692k(d), as never running in any case until "the date the [violation] is discovered [by the plaintiff]." 140 S. Ct. at 360. The Court stressed that it is not for the judiciary to "second-guess" the legislature's decision not to adopt an across-the-board discovery rule to start the filing period, and that courts instead must "simply enforce the value judgments made by Congress." *Id.* at 361 (emphasizing that "many [other] statutes included provisions that, in certain circumstances, would begin the running of a limitations period upon the *discovery* of a violation, injury, or some other event") (citing examples).

This case bears little resemblance to the issue decided in *Rotkiske*. The Unions do not seek, and we do not read into the Hobbs Act, an across-the-board—or any—"de facto discovery rule." Dissent Op. at 2. Here, it was Congress, not this court, that mandated in no uncertain terms that covered agencies promptly provide notice by service or publication after entering

their orders. 28 U.S.C. § 2344. We simply give the same effect to that statutory notice requirement as *Public Citizen* did, hinging the opening of the window for filing a petition for review on the agency providing some reasonable form of notice to the Unions, and not on the Unions' independent discovery of agency action.

Likewise, it was Congress that declined to make jurisdictional the agency's post-entry provision of notice. By applying *Public Citizen*'s fair-notice-of-entry requirement to the distinctive facts of this record and the agency's unique purely passive-approval process, and accepting the parties' agreement that it was eventually satisfied, we do no surgery on the Hobbs Act—certainly none that differs from the dissenting opinion's agreement that "reasonabl[e]" notice is required, Dissent Op. at 3–4. Holding that the Railroad Administration had to provide "fair notice" to be entitled to repose, *Public Citizen*, 901 F.2d at 153, "enforce[s,]" rather than supplants, "the value judgments made by Congress" regarding this limitations period, *Rotkiske*, 140 S. Ct. at 361. To the extent the dissenting opinion dismisses the application of a "fair notice" requirement under the Hobbs Act, it is at war with thirty-year-old circuit precedent that binds this panel. *Compare* Dissent Op. at 2–3 ("More fundamentally, the court's 'fair-notice-of-entry doctrine' contravenes the Hobbs Act, which keys commencement of the sixty-day filing period to 'entry' itself, 28 U.S.C. § 2344, and not to when aggrieved parties receive 'fair notice' of such entry."), *with Public Citizen*, 901 F.2d at 153 (petitioner "first must be put on fair notice" of the agency's entry of its action before the sixty-day filing period runs).

Of course, if the notice requirement were jurisdictional, our hands would be tied. *See e.g.*, *Arbaugh*, 546 U.S. at 513–

516. The agency's failure to provide such notice would be a jurisdictional defect fatal to the Unions' petition. But Congress did not make the provision of notice itself a jurisdictional hurdle—a reading of the statute with which the dissenting opinion agrees. Dissent Op. at 5 (agreeing that the agency's provision of notice, "on its own, is of no jurisdictional consequence"). Yet by fusing together the reasonable provision of notice and the jurisdictional requirement of an entry—such that only a "reasonably" noticed entry creates jurisdiction, *id*. at 4—the dissenting opinion necessarily elevates the notice requirement to jurisdictional effect. That is Congress's job, not the courts'.

The dissenting opinion acknowledges that its approach would allow agencies to evade judicial review of their final actions just by violating the Hobbs Act's notice requirements. Dissent Op. at 5. But it says not to worry because "most agencies * * * sensibly comply with their Hobbs Act obligations." Dissent Op. at 5–6 (citing examples). Thank goodness they do. But that is no help to those parties aggrieved by a recalcitrant agency's statutory defiance.

The dissenting opinion would relegate those parties to the extraordinary remedy of mandamus relief. Dissent Op. at 6; *see Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 944 F.3d 945, 950 (D.C. Cir. 2019) (Mandamus relief is a "drastic and extraordinary remedy reserved for really extraordinary causes.") (quoting *Cheney v. United States Dist. Court*, 542 U.S. 367, 380 (2004)); *see also id.* (noting that mandamus petitioners must demonstrate, among other things, "a *clear and indisputable* right to" the relief they seek) (emphasis added).

That approach, however, is at least a half—if not a total—victory for the misbehaving agency. Requiring aggrieved

parties to navigate the convoluted mandamus road would long delay judicial review and confine it to those few (if any) aggrieved parties who have the resources, time, and legal wherewithal to first pursue mandamus and then, months and months later, start the judicial review process. Still worse, because the Railroad Administration has also disregarded the statutory obligation to establish "rules" for the provision of notice, 28 U.S.C. § 2344, there might first need to be a mandamus action to require the creation of such rules and—if that succeeded—another mandamus action to compel notice in accordance with those rules. And only then could a petition for review follow.

It is hard to wring that crabbed route to judicial review out of the Hobbs Act's text. Or to explain how the Unions' petition is premature when it challenges an (undisputedly) final and (as the agency acknowledges) entered Administration order that has been in operation now for over two and a half years, allowing engineers not properly certified for safety to operate hundreds of northbound and southbound train trips every month on domestic rail lines. It is even harder when analyzed against the strong presumption in favor of judicial review of Railroad Administration action. *See Guerrero-Lasprilla*, 140 S. Ct. at 1069.

**5**

The Railroad Administration separately argues that the Unions' petition does not actually include a challenge to its approval of Kansas City Railway's modified engineer certification program. Railroad Admin. Supp. Br. 3. As the Railroad Administration sees it, the Unions' petition fails to specifically point to the Part 240 approval and, instead, raises only a general challenge to the agency's "purported decision" to allow de México Railway "to operate freight trains in the

United States," Railroad Admin Br. 14, without first requiring de México "to submit its own engineer certification program," Railroad Admin. Supp. Br. 3.

That argument only half reads the petition. Alongside those more general complaints, the Unions' petition also specifies that its challenge includes, among other things, "the * * * certification of" de México Railway's "non-U.S. locomotive engineers and conductors, as well as the review, vetting and approval of such * * * certification by" the Railroad Administration. Petition at 3. That language directly challenges the Railroad Administration's approval of Kansas City Railway's modified engineer certification program. Especially since a petitioner's intent to seek review of a specific order need only be "fairly inferred from the petition for review or other contemporaneous filings[.]" *Entravision Holdings, LLC v. FCC*, 202 F.3d 311, 313 (D.C. Cir. 2000). The Unions' petition satisfies that requirement.

To the extent that the Railroad Administration separately objects that the Unions did not "attach to the petition, as exhibits, copies of the" Railroad Administration's approval of the modified Part 240 engineer certification program, Railroad Admin. Br. 14 (quoting 28 U.S.C. § 2344), that is pure *chutzpah*. It was the Railroad Administration that chose to act through a passive approval process and entirely failed to provide the statutorily required notice of its final order's entry. So there was no paper that the Unions could attach. It should go without saying that we will not dismiss the petition for failing to attach a document that, by agency design, does not exist. But apparently we do have to say it after all.

49

\* \* \* \* \*

For all of those reasons, we have jurisdiction under the Hobbs Act to address the Unions' timely petition from the Railroad Administration's final approval of Kansas City Railway's modified engineer certification program.

**B**

The Unions' petition also challenges several other actions of the Railroad Administration relating to the Railroads' implementation of the new crew change procedures. First, the Unions seek to overturn the agency's acquiescence in Kansas City Railway's application of its existing Part 242 conductor certification program to de México Railway conductors. Second, they argue that the Railroad Administration unlawfully modified or reassigned Kansas City Railway's brake-test waiver by permitting de México Railway workers to operate northbound trains without performing a Class I brake test at the International Bridge. Third, the Unions broadly seek review of multiple other Railroad Administration failures to act pertaining to Kansas City Railway's revised crew change procedures.

Because the administrative record does not show that the Railroad Administration entered a final approval for any of those actions, we do not have jurisdiction under the Hobbs Act to review them.

**1**

Recall that, unlike the engineer certification program, the Railroad Administration's August 2017 audit concluded that "no changes [were] necessary to" Kansas City Railway's existing Part 242 conductor program to enable it to certify de

México Railway conductors under an abbreviated training curriculum. J.A. 390. So Kansas City Railway never submitted a revised, modified, or amended (or even resubmitted its existing) conductor certification program to the Railroad Administration for approval. And the Railroad Administration did not review (let alone approve) any modifications to that conductor certification program.

So there is nothing in the administrative record to point to as a reviewable final agency action taken by the Railroad Administration with respect to Kansas City Railway's certification of de México Railway's conductors under an abbreviated training program.

To be sure, the Railroad Administration took final and reviewable agency action in 2012 when it first approved Kansas City Railway's conductor certification program. But the Unions do not purport to challenge that approval, nor could they timely do so at this juncture.

Neither does the Railroad Administration's audit in 2017 amount to a final and reviewable agency action. The audit itself reached "a merely tentative or interlocutory" decision on the Railroad's proposed cross-border program. *Bennett*, 520 U.S. at 178. The internal audit was sent from two Railroad Administration officials to another official, and it concluded by stating that, subject to further review, the audit team "believe[s]" that Kansas City Railway "has completed the due diligence necessary to certify [de México] engineers and conductors." J.A. 391.

The Railroad Administration explains that the audit represents only "the preliminary views of a subordinate agency official," and not a final determination of the Administration itself. Railroad Admin. Supp. Br. 6. We agree. Without any

showing that the recipient of the audit or any official with authority to bind the Railroad Administration ever ratified the audit team's conclusions, we cannot conclude that the audit constitutes final agency action. *See, e.g.*, *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012); *cf. California Cmtys.*, 934 F.3d at 636; *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531–1532 (D.C. Cir. 1990).

True, Kansas City Railway began, after the audit, to allow de México Railway conductors it had certified to operate on its tracks in the United States. But without more, "[p]ractical consequences" independently put into effect by private parties alone "are insufficient to bring an agency's conduct under our purview." *Independent Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004).

The Unions nonetheless argue that there was final agency action in that, by allowing Kansas City Railway to operate with de México Railway conductors that it had certified, the Railroad Administration must have implicitly waived regulatory and statutory requirements that, in the Unions' view, required de México Railway to obtain its own approved Part 242 certification program for conductors. *See* Unions Reply Br. 9–10.

But the administrative record contains no sign of final agency action whatsoever granting such a waiver, either actively or passively. As far as the record shows, Kansas City Railway's certification of conductors seems to be purely a decision of its own making.

At bottom, the Unions' challenge is to what they see as the Railroad Administration's failure to enforce the laws governing conductor certifications against Kansas City

Railway and de México Railway. That argument runs up against the "well-established tradition" that "an agency's decision not to prosecute or enforce is generally committed to an agency's absolute discretion." *Department of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1906 (2020) (internal quotation marks omitted). And from a practical perspective, a challenge like the Unions' that targets an agency's *refusal* to act, leaves courts without an "action to provide a focus for judicial review." *Id.* (formatting modified). Relabeling that same inaction a "waiver" of legal requirements does not suddenly make the unreviewable reviewable.

For those reasons, there is no final agency action regarding Kansas City Railway's decision to begin certifying de México conductors under its preexisting Part 242 conductor certification program, and we lack jurisdiction under 28 U.S.C. § 2342 to entertain the Unions' objections to that program's operation.

**2**

The Unions also seek our review of the Railroad Administration's asserted indication that Kansas City Railway's brake-test waiver can also be used by de México Railway conductors. The Unions point in particular to an internal June 6, 2018 Railroad Administration email noting that Kansas City Railway "currently operates under a [brake-test] waiver" for northbound trains, and that, under the new crew change procedure, "this will still be the case." J.A. 559; *see also* Oral Arg. Tr. 51:17–23.

The Railroad Administration argues that the email is nothing more than a lone staffer's response to "questions about how the new crew change procedures work." Railroad Admin. Br. 18. That is in some tension with the Railroad

Administration's repeated arguments in this court that, "[c]ontrary to the [U]nions' views[,] * * * the existing brake test waiver applies to all trains operating on [Kansas City Railway's] tracks at the border, including trains operated by [de México Railway] crews (who are certified under [Kansas City Railway's] engineer and conductor certification programs)." Railroad Admin. Br. 22. And the Railroad Administration does not dispute its own knowledge that de México Railway crewmembers are, and have been for quite some time, using Kansas City Railway's brake-test waiver for their own operations.

But like the conductor certifications, the record shows only that the Railroad Administration has knowingly allowed the Class I brake-test waiver's use by de México Railway crews. Nothing in the administrative record surfaces an actual final action by the agency granting an extension of Kansas City Railway's brake-test waiver or otherwise assigning it to de México Railway. Nor can counsel's argument to this court retroactively create final agency action that the administrative record itself does not reveal. *Cf. SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). "[W]e have held often enough that when an agency has not yet made any determination or issued any order imposing any obligation, denying any right, or fixing any legal relationship, the agency action was not reviewable." *Independent Equip.*, 372 F.3d at 427 (formatting modified). Neither may we review the Railroad Administration's failure to bring an enforcement action regarding the asserted violation of brake-test regulations. *See Regents*, 140 S. Ct. at 1906.

**3**

Apart from those discrete objections to the Railroad Administration's actions or inaction, the Unions describe their petition as more broadly challenging the Railroad

Administration's approval of a "Pilot Program allowing a Mexican railroad company, using Mexican train crews, to regularly operate freight trains within the United States free from U.S. rail safety requirements." Unions Br. 1. In addition to the engineer certifications, conductor certifications, and expanded brake-test waiver, the Unions assert that the Railroad Administration has wrongly permitted de México Railway crews to operate in violation of agency regulations governing communication protocols and hours of service restrictions, without going through the necessary procedural requirements for granting regulatory waivers. *See* Unions Br. 43–47.

The Railroad Administration, for its part, categorically denies that it has adopted a "so-called 'Pilot Program,'" and denies that it has granted any regulatory waivers, *de facto* or otherwise. Railroad Admin. Br. 11–12, 15–20. Far from it, the Railroad Administration insists that de México Railway must fully comply with all regulations when operating within the United States, and that the Administration "may initiate enforcement proceedings" if it does not. *See* Railroad Admin. Br. 22.

Because the Unions' arguments sound in terms of a failure to enforce the law, rather than final-action review, we likewise lack jurisdiction to entertain these portions of the petition for review. The Unions have failed to identify anything in the administrative record evidencing that the Railroad Administration has either excused any of the railroads from complying with the regulations, or otherwise reached a final determination that all planned and ongoing operations are in full compliance with statutory and regulatory requirements. Instead, the Unions simply assert that the de México Railway crews have been or must be violating certain specific safety

regulations and fault the Railroad Administration for not stopping them.

For example, the Unions assert that the Railroad Administration has provided "[u]nlawful relief from" various hours of service regulatory provisions. Unions Br. 43–47. But as evidence of such "unlawful relief," the Unions point only to the *absence* of any agency documentation definitively proving that the crews are (or are not) in compliance. *See* Unions Br. 43–47.

The Unions also cite Kansas City Railway's July 2017 draft implementation document entitled "Int[ernational] Crew Hours of Service Reporting Use Case." Unions Br. 46–47; J.A. 362. The Unions insist that the draft Railway plan "is patently inadequate in scope and substance" to ensure compliance by de México Railway crews with hours of service limitations. Unions Br. 46.

But nothing in the administrative record shows that the Railroad Administration ever finally approved—either affirmatively or passively—the Railway's draft document. Neither is there any evidence that the Administration has otherwise made a final determination that ongoing operations comply with any or all of the regulatory limitations on hours of service. Nor does anything in the record indicate that the Railroad Administration "exempted [de México Railway] crews from hours-of-service regulations when operating within the United States," or otherwise "granted" the Railroads "*de facto* general waiver[s]" from other applicable regulations, Railroad Admin. Br. 22.

At bottom, what the Unions denominate final agency action granting a regulatory waiver is, on this record, nothing more than the Railroad Administration's failure to bring

enforcement actions for alleged regulatory violations. Whatever tools parties may have to prod an agency off the regulatory sidelines, they do not on this record include judicial review under the Hobbs Act.

To be sure, Kansas City Railway did share with the Railroad Administration its "International Crew Pilot Program" early on as it went about developing its proposal for new crew change procedures. *See, e.g.*, J.A. 44–47. Also, in a June 6, 2018 internal email, a Railroad Administration official stated that "the plan" had been reviewed, and that "Mexican crews will be in compliance with all [Railroad Administration] regulations." J.A. 559.

But that is of no help to the Unions. Reviewing a plan is not the same as approving or adopting it. Back and forth communications between a regulatory official and the party it regulates are commonplace. That does not transform every document drafted by the regulated party or comment made by a regulatory official into final action by the agency. Internal Railroad Administration communications expressing opinions about whether various features of the cross-border program would comply with regulatory requirements do not "mark the consummation of the agency's decisionmaking process" that could confer legally enforceable rights on the Railroads. *Bennett*, 520 U.S. at 178 (internal quotation marks omitted).

There is little doubt that the Railroad Administration's shadowy and unwritten processes make it difficult for aggrieved parties to navigate the Hobbs Act's jurisdictional constraints. But this court cannot exercise judicial review of agency action beyond what Congress permits. Nor does this

case involve a challenge to the Railroad Administration's procedures themselves.[5]

## III

Finally, we turn to the merits of the Unions' challenge to the one final agency action over which we have jurisdiction— the Railroad Administration's approval of Kansas City Railway's revised engineer certification program that allows that railroad to use its abbreviated program to certify de México Railway engineers. Because the Railroad Administration chose to passively approve that program without any explanation or discernible reasoning, the track to invalidation is short.

In reviewing final orders under the Hobbs Act, we use "the familiar standards [of review] set forth in the" Administrative Procedure Act, *see* 5 U.S.C. § 706. *BNSF Ry. Co. v. Department of Transp.*, 566 F.3d 200, 203 (D.C. Cir. 2009); *see also Interstate Commerce Comm'n v. Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 282 (1987) (While the Hobbs Act includes a general grant of jurisdiction, "it is the Administrative Procedure Act * * * that codifies the nature and attributes of judicial review.").

The APA, in turn, "requires agencies to engage in reasoned decisionmaking," *Regents*, 140 S. Ct. at 1905 (internal quotation marks omitted), and mandates that

---

[5] Because we conclude that none of these three challenges arises from a final agency action, we need not address the parties' arguments about the timeliness of these portions of the Unions' petition.

reviewing courts "hold unlawful and set aside agency action, findings, and conclusions found to be * * * arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). To put a finer point on it, the APA requires agencies to reasonably explain to reviewing courts the bases for the actions they take and the conclusions they reach. *See Regents*, 140 S. Ct. at 1907.

The Railroad Administration's approval of Kansas City Railway's Engineer Certification Program empowered that Railway, for the first time, to train and certify engineers of a different and foreign railroad over which it exercises no apparent control—de México Railway—under an abbreviated curriculum.

Recall that de México Railway is only a foreign affiliate of Kansas City Railway, and there is no indication that Kansas City Railway exerts any control over de México Railway or the performance of its railway crews. *Cf. Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2087 (2020) ("[I]t is long settled as a matter of American corporate law that separately incorporated organizations are separate legal units with distinct rights and obligations.") (citations omitted); *id.* ("Even though the foreign organizations have affiliated with the American organizations, the foreign organizations remain legally distinct from the American organizations."). Indeed, as part of developing the new crew change operations, the Railroads separately had to grant de México Railway operating rights over their 9.2-mile stretch of track in the United States.

Yet Railroad Administration regulations require "[e]ach railroad" operating within the United States to submit to and receive from the Railroad Administration approval for *its* training program for the engineers it employs. 49 C.F.R.

§ 240.101(a) ("Each railroad subject to this part shall have in effect a written program for certifying the qualifications of locomotive engineers."); *id.* § 240.101(b) ("Each railroad shall have such a program in effect prior to commencing operations."); *id.* § 240.103 ("Each railroad shall submit *its* written certification program and a description of how *its* program conforms to the specific requirements of this part * * * and shall submit this written certification program for approval at least 60 days before commencing operations.") (emphases added).

The statute likewise instructs the Railroad Administration to "establish a program requiring the licensing or certification * * * of any operator of a locomotive" "through review and approval of *each* railroad carrier's operator qualification standards[.]" 49 U.S.C. § 20135(a), (b)(1) (emphasis added); *see also id.* § 20102 (defining a "railroad carrier" as "a person providing railroad transportation"). To be sure, the statute also allows the Railroad Administration, "upon petition by a group of commonly controlled railroad carriers that the [Administration] determines is operating within the United States as a single, integrated rail system," to "by order treat the group of railroad carriers as a single railroad carrier[.]" *Id.* § 20102(3). But there has been no such petition, let alone order making those determinations, in this case.

Also, once a certification program is approved, Railroad Administration regulations require each railroad that crosses an operating-revenue threshold to satisfy various monitoring and reporting requirements "concerning the administration of *its* program for responding to detected instances of poor safety conduct by" the engineers it certifies. *See* 49 C.F.R. § 240.309 (emphasis added); *see also id.* § 1201.1-1 (classifications of railroad carriers).

As the Unions see it, the Railroad Administration acted unlawfully when it formally approved Kansas City Railway's modified engineer certification program, allowing that railroad to fulfill de México Railway's independent statutory and regulatory certification obligations. The Unions also challenge the approval on the ground that it permits Kansas City Railway to rely on de México Railway's engineers' operating experience in Mexico—experience gained under a different regulatory regime—as a basis for providing only an abbreviated training protocol normally reserved for engineers previously certified under federal regulations. Unions Reply Br. 23; *see* 49 C.F.R. §§ 240.225, 242.125.

By virtue of the Railroad Administration's passive approval system and the complete absence of any accompanying explanation for the agency's approval of Kansas City Railway's modified engineer certification program, the administrative record is devoid of any explanation or reasoning for the administrative steps taken and legal determinations made by the agency in approving the engineer certification program. Likewise, in searching the administrative record for the rationale by which the agency allowed Kansas City Railway to certify the engineers of another railroad, despite the former's apparent lack of control over de México Railway's crew members, we come up empty-handed. And in a hunt for the reason that service under a foreign regulatory system was credited to allow an abbreviated certification program, we hear only crickets.

All that we have are the Railroad Administration's attorneys' arguments to this court that "it is sufficient for [Kansas City Railway] to certify [de México Railway] crews under its own engineer * * * certification program[,]" and the

approved program "compl[ies] with [Railroad Administration] requirements[.]" Railroad Admin Br. 22.

That will not do. Putting aside the entirely conclusory nature of the arguments, "[i]t is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Regents*, 140 S. Ct. at 1907 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). The "basic rule here is clear: An agency must defend its actions based on the reasons it gave when it acted." *Id.* at 1909.

Here, there are no reasons. Instead, what we confront in this case is a total explanatory void. There is no reason—not one word—in the administrative record for the Railroad Administration's material and consequential decisionmaking on important matters of railroad safety. Not even Kansas City Railway's certification program itself, as submitted to the agency, provides an explanation for the relevant determinations that the Agency presumably reached. When the reasons that an agency provided at the time it took the challenged action "are inadequate[,]" the agency's action may not be sustained. *See, e.g.*, *Regents*, 140 S. Ct. at 1907; *City of Oberlin v. FERC*, 937 F.3d 599, 605 (D.C. Cir. 2019). The Railroad Administration's reasons in this case are even less than "inadequate." They are non-existent.

Vacatur "is the normal remedy" when we are faced with unsustainable agency action. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). In this case, the Railroad Administration has neither asked the court nor given us any reason to depart from that standard course of action. So we vacate and remand for the Railroad Administration either to "offer a fuller explanation of the agency's reasoning at the time of the agency action," or to "deal with the problem afresh

by taking new agency action." *Regents*, 140 S. Ct. at 1907–1908 (formatting modified).

## IV

For all of those reasons, we grant the Unions' petition for review as to the Railroad Administration's approval of Kansas City Railway's use of its modified Part 240 engineer certification program to train and certify de México Railway engineers, and we vacate and remand for further agency action consistent with this opinion. We otherwise dismiss the petition for lack of jurisdiction.

*So ordered.*

TATEL, *Circuit Judge*, concurring in part and dissenting in part: I share my colleagues' exasperation with the Railroad Administration's conduct and agree with much of the court's excellent analysis. But because I believe we lack jurisdiction at this time to review the revised engineer certification program, I reluctantly dissent from that portion of the court's opinion.

The Hobbs Act requires that "[o]n the entry of a final order," an agency "shall promptly give notice thereof by service or publication in accordance with its rules" and that a party aggrieved by that order must file any petition for review "within 60 days after its entry." 28 U.S.C. § 2344. The sixty-day period acts as a "filing window," barring consideration not only of "petitions filed more than sixty days after entry" but also of "petitions filed prior to entry of the agency orders to which they pertain." *Western Union Telegraph Co. v. FCC*, 773 F.2d 375, 377, 378 (D.C. Cir. 1985).

In this case, although the Railroad Administration ostensibly entered the certification program's approval in February 2018, it wholly ignored its statutory duty to "promptly give notice thereof"; indeed, the agency has never even promulgated "rules" for the "service or publication" of such decisions. 28 U.S.C. § 2344. The court readily acknowledges these failures and that, as a result, the Unions filed their petition more than sixty days after entry occurred. *See* Majority Op. at 35, 38. It nevertheless finds the petition timely on the ground that the Hobbs Act's sixty-day clock did not begin running until the Unions had "'fair notice' of the entry," *id*. at 40 (quoting *Public Citizen v. Nuclear Regulatory Commission*, 901 F.2d 147, 153 (D.C. Cir. 1990)), namely, when, on July 9, 2018, "the Unions witnessed Kansas City Railway put the crew changes into effect 'with [the Administration]'s presence and support,'" *id*. at 36 (quoting Unions Supp. Reply Br. 6) (citing Administrative Record (A.R.) 1250). On the court's account, then, the petition was not too early because it came after the program's entry and not too

late because it was filed within sixty days of when the Unions "first learned" of the agency's decision. *Id*.

The court's holding is difficult to square with its own "fair-notice-of-entry requirement," *id*. at 41, as the court fails to explain how the Railroad Administration's mere "presence and support," *id*. at 36 (quoting Unions Supp. Reply Br. 6), "reasonably put[] aggrieved parties on notice" of the challenged agency action, *RCA Global Communications, Inc. v. FCC*, 758 F.2d 722, 730 (D.C. Cir. 1985). Surely not all potentially aggrieved parties happened to "witness[]" the crew change go into effect, as did the Unions. Majority Op. at 36. And even if they had, it would take something like divine guidance to deduce from the Railroad Administration's opaque involvement in the rollout that the agency, months earlier, had passively approved the railway's revised engineer program. *See* A.R. 2150 (detailing the agency's limited participation in the program's launch). True, the Unions had a rough notion of the program's approval by July 9, *see* Unions Supp. Reply Br. 6, though that might well have been because they were informed of the decision days earlier, *see* Transcript of Motion Hearing at 68–69, *Kansas City*, 2018 WL 7253969 (No. 5:18-cv-00071), ECF No. 24. In any event, if the measure of fair notice is actual notice for one set of aggrieved parties, then the court's fair-notice requirement collapses into nothing more than a de facto discovery rule, with petitions' timeliness turning on the happenstance of when aggrieved parties (or just one aggrieved party) learn of the agency's action. *But see Rotkiske v. Klemm*, 140 S. Ct. 355, 360 (2019) (cautioning against reading notice-based discovery exceptions into statutory filing requirements and calling such "[a]textual judicial supplementation . . . inappropriate").

More fundamentally, the court's "fair-notice-of-entry requirement" contravenes the Hobbs Act, which keys

commencement of the sixty-day filing period to "entry" itself, 28 U.S.C. § 2344, and not to when aggrieved parties receive "fair notice" of such entry, Majority Op. at 40 (quoting *Public Citizen*, 901 F.2d at 153). Tellingly, because the Hobbs Act requires agencies to give notice only "promptly," i.e., not simultaneously with entry, 28 U.S.C. § 2344, the statute expressly contemplates orders being entered and the filing window opening before aggrieved parties learn of agency action, *see, e.g.*, *Energy Probe v. Nuclear Regulatory Commission*, 872 F.2d 436, 437 (D.C. Cir. 1989) (explaining that "[t]he Secretary's letter informing petitioners of the Commission's final action was signed and stamped 'served' on September 13" and that "[t]he sixty-day period therefore began to run from that date," even though petitioners did not receive the letter "until September 26").

In my view, rather than delaying the filing period, the Railroad Administration's failure to give notice invalidated the jurisdictional effect of the approval's entry. Put differently, instead of pushing back the start of the filing window, the lack of notice meant the window never opened. This is evident from our court's decision in *Public Citizen v. Nuclear Regulatory Commission*, 901 F.2d 147 (D.C. Cir. 1990). There, the agency argued that the Hobbs Act's sixty-day filing period should be measured not from when the challenged action was published in the Federal Register but from when, prior to such publication, a paper reflecting that decision "was made available to the public in the [agency's] public document room." *Id*. at 153 (internal quotation marks omitted). Rejecting that argument out of hand, we explained that although agencies have "considerable latitude in determining the event that triggers commencement of the judicial review period, [they] must do so reasonably." *Id.* (citation omitted) (internal quotation marks omitted). And because "[p]otential petitioners [should not] be expected to squirrel through [an agency's]

public document room in search of papers that might reflect final agency action," we concluded that the "mere placement of a decision in an agency's public files, without any other announcement," could not reasonably "start the clock running for review." *Id.*

Under the plain terms of the Hobbs Act, the jurisdiction-triggering event—that is, the event that opens the filing window—is "entry." 28 U.S.C. § 2344. *Public Citizen*, then, necessarily stands for the proposition that however agencies choose to enter orders, they "must do so reasonably." 901 F.2d at 153. And entering an order "without any other announcement" is simply unreasonable, *id.*, as agency action "cannot be said to have been issued for purposes of defining rights . . . if its substance is merely in the bosom of the [agency]," *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 676 (1950). In such circumstances, the filing window remains shut because the "event that triggers commencement of the judicial review period," i.e., entry, has not "reasonably" occurred. *Public Citizen*, 901 F.2d at 153 (internal quotation marks omitted). Only when the agency properly enters its order—by, for example, publishing it in the Federal Register—does the "clock" start "running for review." *Id.*

That logic controls here. The Railroad Administration gave no notice—prompt, fair, or otherwise—of the certification's February 2018 approval. Contrary to the court's conclusion, then, the Hobbs Act's filing window did not open at that time because entry, the jurisdiction-triggering event, had not reasonably occurred. And unlike in *Public Citizen*, where the agency eventually entered its decision properly by publishing it, thereby "start[ing] the clock running for review," 901 F.2d at 153, to this day the Railroad Administration has yet to publish or serve its decision, *see* Majority Op. at 35, meaning that the program's approval was invalidly entered and that the

sixty-day window never opened. Because the Union's petition was "filed prior to entry of the action[] to which [it] pertain[s]," *Western Union*, 773 F.2d at 378, we lack jurisdiction.

The court criticizes this approach for "fusing together" the Hobbs Act's "reasonable provision of notice and the jurisdictional requirement of an entry," thus "elevat[ing] the notice requirement to jurisdictional effect." Majority Op. at 46. But as explained above, it is entry, and entry alone, that, as the court says, "packs the jurisdictional punch." *Id*. at 43. Notice is merely an indicator of whether entry has "reasonably" occurred, *Public Citizen*, 901 F.2d at 153, and, on its own, is of no jurisdictional consequence. Thus, the Hobbs Act's sixty-day window may open even before parties receive notice of an order's entry, *see, e.g.*, *Energy Probe*, 872 F.2d at 437, just as it may remain shut even after they first learn of final agency action, *see, e.g.*, *Western Union*, 773 F.2d at 377–78. In fact, by holding that a petition's timeliness depends on when aggrieved parties receive fair notice of an order's entry, it is the court that "elevates" notice's "jurisdictional effect." Majority Op. at 46.

The court rightly worries about agencies ignoring their statutory duties in order to evade judicial review. *See id*. But most agencies, including other constituent agencies of the Department of Transportation, sensibly comply with their Hobbs Act obligations. *See, e.g.*, 10 C.F.R. § 2.305(a) (Nuclear Regulatory Commission) ("[T]he Commission shall serve all orders, decisions, notices, and other documents to all participants, by the same delivery method those participants use to file and accept service."); 49 C.F.R. § 397.219(d) (Federal Motor Carrier Safety Administration) ("The Administrator serves a copy of the order upon . . . any . . . person readily identifiable by the Administrator as one who may be affected by the order. A copy

of each order is [also] placed on file in the public docket."). And we have a ready-made solution for an outlaw agency, like this one, that insulates itself from review only by blatantly flouting its statutory obligations, i.e., mandamus. *See In re Public Employees for Environmental Responsibility*, 957 F.3d 267, 273 (D.C. Cir. 2020) (explaining that "mandamus relief is appropriate" where "agencies have failed to comply with their statutory mandate"). To be sure, the Unions would first have to initiate proceedings to force the Railroad Administration's compliance with the Hobbs Act before they could challenge the agency's decision on the merits. But aggrieved parties must occasionally take such additional steps where, as here, an agency has "clear[ly] and indisputab[ly]" violated its statutory mandate, and they "have no other adequate means to attain the relief [they] desire[]." *Cheney v. U.S. District Court for D.C.*, 542 U.S. 367, 381–82 (2004) (internal quotation marks omitted). Indeed, had the Unions styled their petition as one for mandamus relief, I would have surely voted to grant it.

Anyway, I trust that the Railroad Administration will take this court's unanimous condemnation of its "statutory defiance," Majority Op. at 47, as a clear message that it should revise its procedures to ensure that, however it chooses to enter final orders, it "promptly give[s] notice thereof," 28 U.S.C. § 2344.